**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 12, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RICHARD GIANNETTI, as personal
representative of the Estate of Mary
Giannetti, deceased,

       Plaintiff-Appellant/
       Cross-Appellee,

    v.

CITY OF STILLWATER, a municipal
corporation and/or political
subdivision; NORMAN McNICKLE,
individually and in his official
capacity as Chief of Police for City of
Stillwater; LINDELL MILLER,
SCOTT WHITLEY, and BRUCE
MCDOUGAL, individually and in
their official capacity,

       Defendants-Appellees/
       Cross-Appellants.

Nos. 06-6085, 06-6094
(W.D. Oklahoma)

(D.C. No. 04-CV-926-BA)

---

**ORDER AND JUDGMENT**[*]

---

    [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Before **HENRY** and **BRISCOE**, Circuit Judges, and **ROBINSON**, District Judge.[**]

This appeal stems from the tragic events of May 1, 2003, which resulted in Mary Giannetti's untimely death. Ms. Giannetti died after a struggle with several officers in the City of Stillwater municipal jail, where the officers restrained her after they arrested her for eluding the police, a misdemeanor. The struggle ensued when she violently refused to put on a jail jumpsuit. Mr. Giannetti, Ms. Giannetti's personal representative and also her widower, sued the City and the involved officers, alleging state law claims of negligence and federal claims of excessive force and inadequate training under 28 U.S.C. § 1983.[1] The district court granted summary judgment to the defendants, finding that the officers did not use an unreasonable quantum of force. For the reasons below, we affirm.

## I. BACKGROUND

Although the Stillwater municipal jail used audio and video recording equipment to record the encounter, the events that unfolded in this matter are less clear than optimal. The audiotape is of such poor quality so as to be useless; the

---

[**] The Honorable Julie A. Robinson, U.S. District Judge, District of Kansas, sitting by designation.

[1] The officers did not bring a summary judgment motion on the state law claims, over which the district court exercised supplemental jurisdiction. Before the district court, the parties stipulated to a dismissal of the state law claims. In this appeal, Mr. Giannetti does not preserve the failure to train claim.

video has an important gap where critical facts occur. In addition, the camera's angle fails to portray the most relevant view. As such, we are confined to the officers' characterizations of the events that occurred.

On May 1, 2003 at 4:45 a.m., Officer Lindell Miller noticed Ms. Giannetti driving southbound on Perkins Road, U.S. Hwy 177, without using her headlights. Officer Miller engaged his emergency overhead lights and followed Ms. Giannetti, who did not stop. Ms. Giannetti continued at an excessive rate of speed to her home, without signaling or heeding traffic signs. Officer Miller called for backup, and Officers Jeff Dillon and Tom Comstock responded to the call. Ms. Giannetti pulled into her driveway. Having unholstered his weapon, Officer Miller approached Ms. Giannetti, and asked her to keep her hands up. Ms. Giannetti raised and lowered her hands, and began to rummage in her purse.

Officers Dillon and Comstock arrived and surrounded the car. A fourth officer, Lieutenant Robert B. McDougal, also arrived at the scene.[2] Lt. McDougal was apparently familiar with Ms. Giannetti and her mental health issues. Officer Miller holstered his weapon when he was convinced that Ms. Giannetti was unarmed.

---

[2] Officer Miller and Lt. McDougal are each CLEET ("Council of Law Enforcement Education and Training") certified officers, with approximately 1,300 hours of training as of May 1, 2003. This training includes administration of proper restraint techniques and dealing with mentally ill persons. Aplt's App. vol. I, at 68 (Defs' Mot. for Summary Judgment). Defendant Detention Officer Whitley had approximately 344 hours of certified training.

-3-

Ms. Giannetti, who was clinically obese and had been diagnosed with bipolar disorder, proceeded to lock herself in the car and refused to exit. She insisted she could not be arrested since she was now at her home. She also stated nonsensically that she had liver and onions in the car and was going to eat Officer Comstock. Officer Comstock also recognized Ms. Giannetti from previous official interactions.

Ms. Giannetti eventually relented and exited the car. After a brief struggle, the officers handcuffed her and placed her under arrest for eluding the police, a misdemeanor. Officer Miller escorted Ms. Giannetti, whom he noticed was perspiring heavily, to the Stillwater City Jail. At 5:08 a.m., Detention Officer Scott Whitley took custody of Ms. Giannetti at the jail.

Detention Officer Whitley took Ms. Giannetti to the jail booking area and seated her on a bench. Officer Miller went to the control room adjoining the booking area and began preparing reports pertaining to Ms. Giannetti's arrest. Lt. McDougal joined Officer Miller there. Officer Miller and Lt. McDougal could easily see and hear what was going on in the booking area and surrounding rooms from this location.

Detention Officer Whitley asked Ms. Giannetti for some general information regarding her identity, next of kin, emergency contacts, and any medical conditions. He asked whether she had been drinking, had taken any drugs, or had a psychiatric history; she replied "no" to each of these. Aplt's App.

vol. I, at 261. Detention Officer Whitley asked her if she had any suicidal tendencies; she replied "no." *Id.* at 261-62. When he asked Ms. Giannetti about specific illnesses, she interrupted and told him that she took "chill pills," specifically Depakote, and that she was allergic to penicillin. *Id.* at 262. At one point Ms. Giannetti complained that the handcuffs were too tight. Detention Officer Whitley checked the cuffs, and found her hands had good color, and that the handcuffs had slipped up her arm a little. He stated that she was perspiring heavily, which he believed was consistent with someone who might have taken methamphetamine.

Detention Officer Whitley also noted that Ms. Giannetti was fidgeting during the booking process. When he was inventorying her belongings, specifically her coin purse, Ms. Giannetti became defensive. There were no drugs, prescription or otherwise, in the purse. Detention Officer Whitley was curious about a strange colored bottle of breath drops, which later tested negatively for contraband. When he asked Ms. Giannetti about the bottle, she informed him that her daughter had given her the bottle, and to leave it alone. Detention Officer Whitley testified that this behavior suggested to him that Ms. Giannetti might be under the influence of an illegal substance.

Detention Officer Whitley also testified that, for suspects who are booked, standard policy directs that a suspect change into a jumpsuit only if officers suspect that the detainee is on drugs, hiding contraband, or wearing clothing that

the officers deem dangerous. His testimony indicates he suspected Ms. Giannetti might "be on drugs." *Id.* at 301. He noted that dispatch had called for a female officer to assist with the process of monitoring Ms. Giannetti's change into prison garb.

OSU Police Dispatcher Tamara Stumbaugh arrived to assist Ms. Giannetti change in the bio-hazard ("haz-mat") room, which adjoined the booking area. Detention Officer Whitley removed Ms. Giannetti's handcuffs, escorted the two to the haz-mat room, and returned to the booking area. Detention Officer Whitley instructed Dispatcher Stumbaugh that Ms. Giannetti had to be "changed out." *Id.* at 330. While in the haz-mat room, Dispatcher Stumbaugh said she retrieved an orange jumpsuit from a cabinet and explained to Ms. Giannett that she would have to put the jumpsuit on. Ms. Giannetti stated she was not going to change. After further verbal protest, Dispatcher Stumbaugh stated that Ms. Giannetti hit her in the left lower jaw.

At this time, Officer Miller, Lt. McDougal, and Detention Officer Whitley heard a commotion in the haz-mat room.[3] Ms. Giannetti can be heard saying "I'm

---

[3] We note that the Stillwater Police Department's video recording of the incident stops just shortly after Detention Officer Whitley heard the commotion and entered the haz-mat room (at approximately 5:33:28 a.m.). The events that took place in the haz-mat room were apparently recorded by an audio-only device, the results of which are indecipherable. The video recording resumes from a different camera position at approximately 5:47:08 a.m., when the camera films an officer just outside the door of the haz-mat room looking in on Ms. Giannetti. Although such recordings might be useful, they provide little insight into what

(continued...)

not changing." Upon entering the haz-mat room, Detention Officer Whitley handcuffed Ms. Giannetti, who fell to her knees. Officer Miller and Lt. McDougal shifted Ms. Giannetti to a facedown position. After some struggling, Dispatcher Stumbaugh was able to take off Ms. Giannetti's socks, at which point she discovered Ms. Giannetti was wearing pantyhose. At this point, Officer Whitley observed that these too would have to be removed to ensure that the pantyhose would not be used as a suicide instrument.

During a process that lasted approximately ten to fifteen minutes, the officers took off Ms. Giannetti's pantyhose and placed the jumpsuit uniform on the lower half of her body. During the majority of that time, Ms. Giannetti was struggling with three male officers – kicking with her legs, moving her head, and using her nails to dig into one officer's arm – while the officers held her legs, arms, head, and back down in an effort to keep her from moving. At one point, Ms. Giannetti kicked Officer Miller in the chest so that he was forced backwards into a locker. Detention Officer Whitley and Officer Miller told Ms. Giannetti several times the pantyhose had to come off. Ms. Giannetti responded that "they can't come off, they won't come off." *Id.* at 152. Lt. McDougal instructed the officers to remove the pantyhose because Ms. Giannetti would not.

---

[3](...continued)
happened during the nearly twenty minutes Ms. Giannetti lay prone inside the haz-mat room.

At one point, Detention Officer Whitley had his hands on Ms. Giannetti's shoulder blades and Officer Miller restrained her legs in a figure four restraint (placing one foot behind the knee of the opposing leg and then bending that leg so as to control both feet). Lt. McDougal then took over for Detention Officer Whitley, who helped Officer Miller restrain Ms. Giannetti's legs. Dispatcher Stumbaugh removed her sweatpants and panythose, while Ms. Giannetti continued to struggle.

Officer Miller subsequently shifted spots again, and Lt. McDougal placed his left knee towards the middle of Ms. Giannetti's back. Lt. McDougal stated that he applied only the amount of pressure necessary to keep Ms. Giannetti from rising. Lt. McDougal placed his left calf across her head. He then shifted and placed his left knee on her right shoulder with his leg across the back of her neck.

Officer Miller and Detention Officer Whitley testified that Ms. Giannetti expressed at least twice during the struggle that she was having difficulty breathing by "scream[ing]" that her "lungs were collapsing" and at least once indicated that "she couldn't breathe." *Id.* at 160 (Officer Miller testifying that "Giannetti stated she could not breathe, her lungs were collapsing, and we were hurting her"), 307-08 (Detention Officer Whitley testifying that "at least a couple of times" she "screamed" that her "lungs are collapsing"). According to Officer Miller and Dispatcher Stumbaugh she also begged for the officers to "stop, you're killing me you're hurting me. " *Id.* at 164 (Officer Miller noting that she moaned

-8-

that "we're killing her, that we're hurting her"); 353 (Dispatcher Stumbaugh testifying that Ms. Giannetti said "stop, you're hurting me"). Officer Miller also noted that she pleaded "please stop, oh, God, please." *Id.* at 164.

Detention Officer Whitley and Officer Miller assisted in putting the jumpsuit on Ms. Giannetti. After it was up to her waist, the officers decided to let Ms. Giannetti finish changing herself, although she was still in handcuffs. Officer Miller asked Ms. Giannetti to sit up and walk or she would have to be carried. Ms. Giannetti did not answer. Officer Miller testified that at this point Ms. Giannetti remained handcuffed, and was lying partially on her stomach. Lt. McDougal left the room to get assistance to carry Ms. Giannetti. Officer Miller noted that during this time she "had rolled more to her side." *Id.* at 166.

Officer Miller monitored Ms. Giannetti every thirty seconds or so to see if her ribs were moving. He noticed that after about ninety seconds, she did not appear to be breathing, and that, after rolling her onto her back, her lips were "slightly bluish." *Id.* at 168. After calling for help, Officer Miller and Lt. McDougal began CPR, while Ms. Giannetti's wrists remained handcuffed behind her back.

Detention Officer Whitley called for an ambulance, and within three minutes, the medical officer from the Stillwater Fire Department arrived. The ambulance crew took Ms. Giannetti to the Stillwater Medical Center, where she died later that day.

The Oklahoma Medical Examiner's Officer initially determined that Ms. Giannetti died from "probable cardiac dysrhythmia during agitated state." *Id.* at 438. Oklahoma's Chief Medical Examiner amended those findings and determined that she died from "anoxic encephalopathy due to probable cardiac dysrhythmia due to restraint/positional asphyxia." *Id.* vol. II, at 662. Mr. Giannetti filed this action in the United States District Court for the Western District of Oklahoma pursuant to 42 U.S.C. § 1983. The complaint alleged that the defendant officers violated his wife's Fourth Amendment rights by subjecting her to excessive force while acting under color of law, and that Ms. Giannetti died as a result of such excessive force. The complaint also alleged that the City failed to properly train, educate, and supervise the officer defendants, and that the defendant officers' negligence resulted in Ms. Giannetti's wrongful death.

The defendants filed a motion for summary judgment, and the district court granted that motion, finding that the officers acted reasonably under the Fourth Amendment, and did not engage in the use of excessive force.[4] As to the state tort claims, the district court ruled that the City was immune under the Oklahoma Governmental Tort Claims Act, but that the individual defendant officers had not presented a summary judgment argument on the state claims. The parties

_____

[4] The parties agreed to have this case heard by a magistrate judge. Thus, this appeal is properly taken from the magistrate judge's entry of final judgment. *See* 28 U.S.C. § 636(c)(3).

-10-

subsequently agreed to a dismissal of the state tort claims. The district court then entered judgment in favor of all the defendants on all claims. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## II. DISCUSSION

Mr. Giannetti contends that the officers used excessive force in violation of the Fourth Amendment when they restrained and handcuffed his wife. He also contends that the City's training materials are relevant to this inquiry. In their cross-appeal, the officers maintain that, even if a reasonable jury could find that they used excessive force during Ms. Giannetti's detention, they are entitled to qualified immunity because at the time of the violation, the existing law was not clearly established so that the unlawfulness of the excessive force was apparent. For the reasons stated herein, we hold that (1) the district court properly granted summary judgment to the officers, (2) Mr. Giannetti's argument that the City's training materials are relevant is foreclosed by our precedent, and (3) the officers' cross-appeal is moot.

### A. Standard of review

We review a grant of summary judgment de novo, construing the factual record and reasonable inferences in the light most favorable to Mr. Giannetti. *Trask v. Franco*, 446 F.3d 1036, 1045 (10th Cir. 2006). Summary judgment is appropriate only where there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The parties do not

dispute the underlying facts, limiting our analysis to whether the district court correctly applied the law. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When a defendant raises the defense of qualified immunity, we must consider two questions: "(1) whether the alleged conduct violated a constitutional right, and if so, (2) whether the law was clearly established at the time of the defendant's actions." *Shrum v. City of Coweta*, 449 F.3d 1132, 1138 (10th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

We must first resolve whether a constitutional violation occurred "because, 'in the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.'" *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 842 (10th Cir. 2005) (quoting *Saucier*, 533 U.S. at 201). We review the district court's grant of summary judgment on the basis of qualified immunity de novo, and affirm only if the record reveals no genuine issue of material fact, such that the moving party is entitled to judgment as a matter of law. *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1142 (10th Cir. 2006).

**B. The officers' use of force was objectively reasonable under *Graham v. Connor***

Following *Saucier* we must first determine whether, on the facts offered in support of Mr. Giannetti's claim, the City of Stillwater officers' conduct violated the constitutional prohibition against the use of excessive force. *See Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2002). Mr. Giannetti contends that the officers' use of force in holding Ms. Giannetti, a mentally ill obese female, in a prone position for ten to fifteen minutes despite her apparent and voiced distress, was an unreasonable and excessive use of force. The district court found that "the undisputed evidence reflects an escalating struggle and, with the increased intensity of the risk to the officers, they responded with additional restraint." Aplt's App. vol. II, at 945 (Dist. Ct. Order filed Feb. 6, 2006). We agree with the district court's conclusions.

All parties agree that the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989), sets forth the applicable excessive force analysis. "[A]ll claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." 490 U.S. at 395. "[L]aw enforcement officers must be 'objectively

reasonable' in their searches and seizures." *Dixon v. Richer*, 922 F.2d 1456, 1461 (10th Cir. 1992).

> [I]n excessive force claims asserted under the Fourth Amendment, the qualified immunity question is usually answered in the Fourth Amendment inquiry. This is because, in the excessive force context, the Fourth Amendment inquiry asks directly whether the police officer reasonably could have believed that the force was necessary under the circumstances.

*Id.* at 1463.

> Determining whether force used to effect a particular seizure is reasonable under the Fourth Amendment requires *a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . .* Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application "*requires careful attention to the **facts and circumstances** of each particular case, including the **severity of the crime** at issue, whether the suspect poses an **immediate threat to the safety of the officers** or others, and whether he is **actively resisting arrest** or attempting to evade arrest by flight.*"
>
> . . . .
>
> In applying this standard, we are to consider the evidence in the light most favorable to [the person who was arrested].

*Id.* at 1462 (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted) (emphasis added).

Additionally, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that

-14-

police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

The Supreme Court has also recognized that "*Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts." *Saucier v. Katz*, 533 U.S. at 205. "It is well settled that the reasonableness standard does not require that officers use alternative, less intrusive means when confronted with a threat of serious bodily injury." *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005) (internal quotation marks omitted). Because *Graham* must "accommodate limitless factual circumstances," we examine the facts and circumstances of Ms. Giannetti's arrest. *Saucier*, 533 U.S. at 205; *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997) (stating that the "reasonableness inquiry under the Fourth Amendment "is a highly fact-dependent inquiry that can only be determined on a case-by-case basis").

1. Severity of the crime

Mr. Giannetti contends that the district court gave short shrift to the negligible severity of the crime in question when analyzing the facts. He argues that Ms. Giannetti was arrested for only a misdemeanor traffic offense, and not a severe offense that would immediately support an increased use of force. While we agree that Ms. Giannetti's original offense did not involve a crime of violence and she was unarmed, and that her odd behavior did not pose an immediate threat

to the assembled group of officers, we must also factor into the equation that Ms. Giannetti had just struck Dispatcher Stumbaugh. While we agree that we must consider the minor nature of Ms. Giannetti's original offense under *Graham*, we must also be mindful of Ms. Giannetti's battery of the dispatcher prior to the officers' use of force.

The Eighth Circuit recently rejected an officer's reliance on multiple minor offenses in support of the reasonableness of his use of pepper spray against the plaintiff:

> Officer Munn's reference to the offenses for which Henderson was arrested–obstructing governmental operations by giving a false name, resisting arrest, public intoxication, and the two outstanding warrants for failure to appear–fails to tip the scales of reasonableness in Officer Munn's favor. The negligible severity of such offenses did not necessarily justify the amount of force used against an individual who, according to Henderson's allegations, already had been subdued and restrained with handcuffs.

*Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006).

However, Ms. Giannetti did attempt to evade, or at least, delay arrest. Mr. Giannetti does not dispute that, while at the jail, after she struck Officer Stumbaugh, the officers' initial handcuffing of Ms. Giannetti was a reasonable intervention. Mr. Giannetti contends that the district court gave short shrift to the negligible severity of the crime in question when analyzing the facts. We agree that we must consider the minor nature of Ms. Giannetti's offense under *Graham*.

2. Immediate threat to the officers and active resistance

Mr. Giannetti next argues that, while his wife was handcuffed and placed in a prone position, she posed little immediate threat to the officers. He argues that her physical struggling and kicking of the officers resulted from fear and panic when faced with hampered breathing and possible suffocation. Such reaction, according to Mr. Giannetti, did not warrant the several officers' extreme and unreasonable use of force to incapacitate a prone and handcuffed Ms. Giannetti. Thus, argues Mr. Giannetti, a jury should decide the reasonableness of force used. *See, e.g.*, *Henderson*, 439 F.3d at 503 ("By the time Henderson was handcuffed and pinned face down on the ground, a reasonable jury could decide Henderson was no longer resisting arrest, even if he had resisted arrest before being subdued."); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.").

Mr. Giannetti also emphasizes his wife's evident mental illness and aberrant behavior during and after the arrest, which he claims was known by the involved officers. Ms. Giannetti had been diagnosed with bipolar disorder and had multiple previous psychiatric admissions. Officer Miller stated that when Ms. Giannetti locked herself in the car she appear "ill-rational" [sic], and that she was perspiring heavily, a possible sign of drug use. Aplt's App. vol. I, at 197-98. Lt. McDougal was familiar with Ms. Giannetti's erratic behavior because of previous interactions with her. Although Ms. Giannetti did not confirm any psychiatric

-17-

history when she answered Detention Officer Whitley's medical history questions, she did explain that she was taking Depakote, which she called "chill pills." *Id.* at 262.

We agree that a detainee's mental health must be taken into account when considering the officers' use of force and it is therefore part of the factual circumstances the court considers under *Graham*. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("It cannot be forgotten that the police were confronting an individual *whom they knew to be mentally ill or retarded*, even though the Officers may *not have known the full extent* of [the plaintiff's] autism and his unresponsiveness. The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.") (emphasis added); *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (noting that an officer's knowledge of mental disability "may also be deemed relevant to the reasonableness inquiry"); *Drummond*, 343 F.3d at 1058 ("[A] detainee's mental illness must be reflected in any assessment of the government's interest in the use of force."); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("[W]e emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.").

Despite Ms. Giannetti's evidently irrational behavior and assuming the officers' familiarity with her mental history, we cannot conclude that the officers used excessive force given the "tense, uncertain, and rapidly evolving" situation presented by Ms. Giannetti's behavior. *Graham*, 490 U.S. at 396-97. As the officers point out, the Seventh Circuit decision in *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), is particularly instructive. Mr. Phillips suffered from several serious medical conditions that were not "observable to the untrained eye," including an enlarged heart, an enlarged thyroid, Graves' disease, and schizophrenia. *See id.* at 590, 594. Like Ms. Giannetti, Mr. Phillips was obese.

Mr. Phillips had been evicted from his hotel room for destroying hotel property. The following day, he returned to his former room undetected by using a key that he had retained. Housekeeping staff detected him, and summoned security, who called the police. When the police entered the room, they found Mr. Phillips "visibly shaking and sweating." *Id.* at 588.

Mr. Phillips did not respond to the officers' inquiries, and he resisted the officers. As recounted by the *Abdullahi* court, the *Phillips* facts are painfully similar to those before us:

> After taking decedent to the ground and subduing him in a manner very similar to the technique used by the defendant officers in this case, the officers left him lying face-down on the ground with his hands handcuffed behind him for approximately five minutes. Decedent's

-19-

weight, his position on the ground and (apparently) his preexisting health problems caused him to suffocate.

*Abdullahi*, 423 F.3d at 770 (describing *Phillips*).

In *Phillips*, as here, the uncontroverted testimony is that the decedent's actions caused the struggle to escalate. Like Mr. Phillips, Ms. Giannetti, once prone on the ground, continued to struggle and kick the officers, at one point sending one officer against a locker. We agree that "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Phillips*, 123 F.3d at 593. "The medical evidence and witness testimony in this case shows that the officers did not punch, slap, kick or otherwise deliver a blow" to Ms. Giannetti. *Id.* "Authorities must be allowed 'to graduate their response to the demands of any particular situation.'" *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) (quoting *United States v. Place*, 462 U.S. 696, 709 n.10 (1983)). Here, the officers were not required to "use alternative, less intrusive means" during the escalating struggle. *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) (internal quotation marks omitted).

Mr. Giannetti contends this case is more like *Drummond*, where the Ninth Circuit acknowledged that the force used was excessive although "some force was surely justified in restraining Drummond so that he could not injure either himself or the arresting officers." 343 F.3d at 1059. Mr. "Drummond was a mentally disturbed individual not wanted for any crime, who was being taken into custody

-20-

to prevent injury to himself." *Id.* Mr. Drummond suffered from bipolar disorder and schizophrenia, and had run out of medication. The officers escorted him to a medical facility, but he did not have the funds to obtain his prescribed medicine. The next night, Mr. Drummond's neighbor called the police to prevent Mr. Drummond, who was hallucinating and in an agitated state, from darting into traffic.

Witnesses noted that the officers knocked Mr. Drummond to the ground and leaned upon his upper neck and torso. The witnesses reported that Mr. Drummond told the officers he could not breathe and was choking, while the officers were laughing. The Ninth Circuit concluded that "after he was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted." *Id.* The court held that "[t]he officers–indeed, any reasonable person–should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id.* Unlike *Drummond*, where Mr Drummond no longer resisted after the officers placed him in a prone position, Ms. Giannetti actively resisted, kicked, and thrashed at the officers. We conclude that the officers' continued use of force to restrain Ms. Giannetti, although perhaps not the least intrusive choice that they could have made, was not unreasonable in response to her escalating opposition. *See Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992)

(noting that Eighth Amendment does not prohibit "*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind") (internal quotation marks omitted).

Our conclusion is buttressed by the Seventh Circuit's holding in *Abdullahi*, 423 F.3d at 771. In *Abdullahi*, unlike here, the plaintiff identified the specific misconduct at issue—the officer's placing his knee on the decedent's back with crushing force. The plaintiff also introduced competent medical evidence establishing that this act directly caused deadly injuries including a collapsed lung and other injuries consistent with extreme external pressure. But the court stated that "the mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment—a plaintiff must identify the specific unreasonable conduct that caused his or her injuries." *Id.* at 770-71. Here, however, Mr. Giannetti can point to no specific act of misconduct that suggests the officers applied excessive force. Even when we construe the facts in the light most favorable to Mr. Giannetti, he cannot establish facts sufficient to survive summary judgement.

## C. Training materials

Mr. Giannetti also relies upon the training materials at the Stillwater police department as further evidence of the officers' unreasonable response. However, our broad ruling in *Tanberg v. Sholtis*, 401 F.3d 1151 (10th Cir. 2005), forecloses this argument. In *Tanberg*, we held that the fact "[t]hat an arrest violated police

department procedures does *not* make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant." *Id.* at 1163-64 (emphasis added). "If [the officers] violated the [department procedures] governing the use of force in effecting arrest, that fact might well be pertinent to the [Stillwater police department's] future decisions to promote, retain, or discipline [them]; it is not relevant to determining if [Ms. Giannetti's] arrest violated the reasonableness requirement of the Fourth Amendment." *Id.* at 1164; *see also Groh v. Ramirez*, 540 U.S. 551, 564 n.7 (2004) (noting that, standing alone, an official is not "deprived of qualified immunity whenever he violates an internal guideline").

**D. Cross-appeal**

The officers argue in their cross-appeal that they are entitled to qualified immunity in this action. Because the district court granted summary judgment to the officers because there was no constitutional violation, it did not reach the qualified immunity analysis. The officers nevertheless contend that they are entitled to qualified immunity because (1) they did not subject Ms. Giannetti to any violation of her constitutional rights, and (2) any violation was not clearly established. The analysis of the excessive force Fourth Amendment claim is identical to our analysis of the first prong of a qualified immunity claim. We reject the officers' apparent suggestion that any further inquiry is needed.

-23-

We reiterate "that taking a cross-appeal was neither necessary nor appropriate for this purpose. Only a party aggrieved by the judgment may appeal, and [the defendants were] 100% successful." *Leprino Foods. Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1290 (10th Cir. 2006) (alteration in original) (internal quotation marks omitted). *See also Phillips v. AWH Corp.*, 363 F.3d 1207, 1216 (Fed. Cir. 2004) ("A party has no right of cross-appeal from a decision in its favor. Similarly, a party who prevails . . . has no right to file a conditional cross-appeal to introduce new arguments or challenge a claim construction, but may simply assert alternative grounds in the record for affirming the judgment") (internal citations and quotation marks omitted), *rev'd on other grounds,* 415 F.3d 1203 (Fed. Cir. 2005) (en banc). Here, the officers are making arguments in the alternative; because they were successful below, they cannot file a cross-appeal.

## III. CONCLUSION

In this case, we confront a sobering demonstration of how quickly a seemingly routine misdemeanor arrest of a mentally disturbed individual may escalate and result in tragic consequences. While the criminal conduct underlying Ms. Giannetti's arrest was not severe, she posed a grave threat to herself and to the officers. Absent evidence that the officers' conduct was objectively unreasonable, the excessive force claim must fail. While in retrospect, one might wonder whether the officers should have foregone the requirement of changing into the jumpsuit, the record makes clear that their responses had to accommodate

-24-

a rapidly deteriorating situation. Moreover, their responses reflected their appropriate concern that Ms. Giannetti was dangerous to herself and others. Accordingly, we AFFIRM the district court's grant of the officers' motion for summary judgment, and DISMISS the officers' cross-appeal as moot.

Entered for the Court,

Robert H. Henry
Circuit Judge