**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 3, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

GAIL WATERS, as personal
representative of the Estate of Alonzo
Ashley,

     Plaintiff - Appellee,

v.

PHILLIP COLEMAN, a Denver Police
Department Officer, in his official and
individual capacity; PETE CONNER, in
his official and individual capacity; JOE
GASCA, in his official and individual
capacity; JUSTIN JONES, in his official
and individual capacity,

     Defendants - Appellants,

and

CITY AND COUNTY OF DENVER,

     Defendant.

No. 14-1431
(D.C. No. 1:12-CV-01856-MSK-BNB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **BALDOCK**, and **GORSUCH**, Circuit Judges.
_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

_____

Police officers Phillip Coleman, Pete Conner, Joe Gasca, and Justin Jones appeal from the district court's denial of qualified immunity in this 42 U.S.C. § 1983 case alleging excessive use of force against Alonzo Ashley, who tragically died after struggling with and being restrained by the officers. We reverse in part and dismiss in part for lack of jurisdiction.

## I. BACKGROUND

On July 18, 2011, Mr. Ashley and his girlfriend visited the Denver Zoo. Mr. Ashley attempted to cool off under a water fountain and zoo patrons called security. Aplt. App., Vol. IV at 346. A zoo security guard questioned Mr. Ashley and the situation escalated. According to the zoo security guard, he was attacked by Mr. Ashley resulting in a few cuts and scrapes. *Id.* at 354; Aplee. Br. at 6 n.1. Because of Mr. Ashley's conduct, zoo employees called the police, and Officer Jones responded to what was reported as a domestic violence incident. When Officer Jones arrived, a zoo employee told him that Mr. Ashley had assaulted a security officer.

Officer Jones drew his Taser, approached Mr. Ashley and ordered him to sit down. Mr. Ashley did so, but then he got up and starting walking toward the exit. Officer Jones followed him, noticing that Mr. Ashley was sweating profusely. That is a symptom of a physiological condition known as excited delirium. As recognized by the district court, "It is often impossible to control individuals experiencing excited delirium using traditional pain compliance techniques. Paradoxically, these

2

individuals are physiologically more likely to die from a prolonged struggle, but also more likely to physically resist restraint."  Aplt. App., Vol. IV at 539.

After about fifteen yards, Mr. Ashley stopped walking.  He then moved toward Officer Jones, and the officer attempted to grab his arms to put them behind his back.  Mr. Ashley resisted, and a zoo security officer joined the struggle.  Officer Jones tackled Mr. Ashley, and at least two more zoo employees attempted to assist.  Mr. Ashley threw punches, and Officer Jones punched him twice in the abdominal area.  He also deployed his Taser in "drive stun" mode to Mr. Ashley's back.

Officer Coleman was the next officer to arrive.  He perceived that Mr. Ashley was resisting Officer Jones and several zoo employees.  After Officer Coleman arrived, Officer Jones deployed his Taser a second time, this time on Mr. Ashley's side.  Officer Coleman deployed his Taser in "drive stun" mode twice.  He noticed that "Mr. Ashley seemed extremely strong," and he heard Mr. Ashley say "something to the effect of 'help me Grandma.  I don't want to go.'"  *Id.* (internal quotation marks omitted).  Unusual strength and mental confusion are both symptoms of excited delirium.

As other officers arrived, they joined the struggle.  Lieutenant Conner and two other officers unsuccessfully used his Orcutt Police Nunchaku (OPN)[1] to try to control Mr. Ashley's legs.  Lieutenant Conner then assisted a zoo employee with handcuffing Mr. Ashley's right wrist and helped control his left arm so his left wrist

---

[1] The Orcutt Police Nunchaku is a controlling device made of two pieces of hard plastic that are connected with a short piece of nylon rope.

3

could be handcuffed. Lieutenant Conner noticed that Mr. Ashley exhibited no reaction to pain-compliance techniques. He suspected that Mr. Ashley was intoxicated or suffering from excited delirium.

When Officer Gasca arrived, he saw two people with their knees on Mr. Ashley's shoulders. He also saw that Mr. Ashley had vomited. He restrained Mr. Ashley's legs by crossing his ankles, bending his knees, putting his ankles to his buttocks, and kneeling or leaning on his legs. Officer Gasca remained in this position for several minutes after Mr. Ashley was handcuffed. He recognized that Mr. Ashley exhibited superior strength and profuse sweating and that the officers had difficulty controlling him.

After Mr. Ashley was handcuffed, he remained on his stomach from two to five minutes, with Officer Gasca restraining his legs during some or all of this time. Lieutenant Conner called for medical assistance. Mr. Ashley again vomited, and Lieutenant Conner directed officers to move him away from the vomit. Mr. Ashley then stopped breathing, and an officer began chest compressions. Paramedics arrived and transported him to the hospital, where he was pronounced dead.

Mr. Ashley's mother, as his personal representative, brought suit against the city, the zoo, and their employees under § 1983 and state law. As relevant to this appeal, the district court denied the officers qualified immunity on the § 1983 claims, holding that a reasonable jury could conclude that the officers used excessive force against Mr. Ashley and that the law prohibiting such excessive force was clearly established at the time of the incident.

4

## II. ANALYSIS

### A. Standard of Review

Our review is de novo. *Blossom v. Yarbrough*, 429 F.3d 963, 967 (10th Cir. 2005). "A district court's denial of a summary judgment motion . . . is subject to immediate appeal when the defendant is a public official asserting qualified immunity and the issue appealed is one of law." *Id.* at 966. But "the scope of our inquiry is limited to legal challenges to the denial." *Id.* "Where the district court has identified facts that it assumed in denying summary judgment, we generally lack jurisdiction to review underlying questions of evidentiary sufficiency. Instead, [we] usually take[] the facts as assumed by the district court in conducting its review of pertinent legal questions" *Id.* (citation omitted).

With regard to certain findings, defendants urge us to apply the exception created by *Scott v. Harris*, 550 U.S. 372, 380 (2007), where the Supreme Court declined to accept facts that were "blatantly contradicted by the record, so that no reasonable jury could believe it." We decline this invitation. Defendants do not present the type of conclusive evidence as was involved in *Scott* (a videotape showing the events) and many of their arguments amount to questioning evidentiary sufficiency, which we lack jurisdiction to address. "[W]e must scrupulously avoid second-guessing the district court's determinations regarding whether [the plaintiff] has presented *evidence* sufficient to survive summary judgment." *Fancher v. Barrientos*, 723 F.3d 1191, 1199 (10th Cir. 2013) (internal quotation marks omitted).

5

**B. Legal Standards**

The legal standards for qualified immunity are well-established: "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established. Only if the plaintiff has satisfied both steps is qualified immunity defeated." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (citation and internal quotation marks omitted). We have discretion to determine which prong to examine first, *Estate of Booker v. Gomez*, 745 F.3d 405, 412 (10th Cir. 2014), although "the Supreme Court has recently instructed that courts should proceed directly to, 'should address only,' and should deny relief exclusively based on the second element" in certain circumstances, *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011) (quoting *Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020, 2032 (2011)).

As to the first qualified-immunity prong, this case is governed by the Fourth Amendment's "objective reasonableness" test. *Graham v. Connor*, 490 U.S. 386, 388, 394-95 (1989). Under this standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. We pay "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The

6

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

As for the second qualified-immunity prong, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (internal quotation marks omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris*, 672 F.3d at 1196. Given the unlikelihood of cases that are factually identical, however, "we have adopted a sliding scale: The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (internal quotation marks omitted). But "existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate."

7

*Plumhoff*, 134 S. Ct. at 2023 (internal quotation marks omitted). If the facts place the case in the "hazy border between excessive and acceptable force," the law is not clearly established. *Brosseau*, 543 U.S. at 201 (internal quotation marks omitted).

The district court examined the conduct of each officer individually. The parties do not object to this procedure, so we do the same. *See, e.g., Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006) ("We will consider the officers' conduct separately for purposes of this de novo [qualified immunity] inquiry.").

### C. Officer Jones

The district court concluded that Officer Jones' conduct could be considered unconstitutional and that *Graham* alone clearly established the law. We need not decide the constitutional issue because the district court erred in concluding that the law was clearly established.

The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (citation, ellipsis, and internal quotation marks omitted). And the Court has characterized *Graham* as "cast at a high level of generality," indicating that it alone can establish the law only in an "obvious case." *Brosseau*, 543 U.S. at 199. As in *Brosseau*, "[t]he present case is far from the obvious one where *Graham* . . . alone offer[s] a basis for decision." *Id.*

The district court found sufficient evidence to support the following facts with regard to Officer Jones. Officer Jones had probable cause to arrest Mr. Ashley for

8

assault. Mr. Ashley initially obeyed the command to sit down but then he got up and started walking toward the exit. Officer Jones followed Mr. Ashley, and he noticed that Mr. Ashley was sweating heavily. But then Mr. Ashley stopped and moved toward Officer Jones. At that point, Officer Jones grabbed Mr. Ashley's arms. Mr. Ashley resisted; Officer Jones then tackled him, and as they struggled, punched him in the stomach twice and deployed the Taser twice.

The question then is whether case law existing as of July 2011 would alert any reasonable officer that (1) when faced with an assault suspect who was apparently attempting to leave the area, who may have been suffering from excited delirium, and who then moved toward him, it would be excessive force for the officer to grab the suspect's arms; and (2) when the suspect forcibly resisted, it would be excessive to escalate the amount of force and tackle him to the ground, punch him twice in the stomach, and deploy a Taser twice. We conclude that the law in this circuit as of July 2011 would not have put a reasonable officer on notice that this conduct could be considered excessive.

First we consider the initial use of force. Officer Jones had probable cause to arrest Mr. Ashley for assault. "In *Graham*, the Court noted that the Fourth Amendment recognizes the right of the police, in making an arrest or a stop, 'to use some degree of physical coercion or threat thereof to effect it,'" *Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993) (quoting *Graham*, 490 U.S. at 396), and grabbing Mr. Ashley's arms was not a great use of force, *see Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997) (grabbing person's arm was "a

9

relatively minor application of force"). If the encounter had ended there, it is unlikely that a court would conclude even the first qualified-immunity prong was satisfied. *See Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007) ("We have little difficulty in concluding that a small amount of force, like grabbing [plaintiff] and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment.").

The district court was troubled by the fact that Officer Jones noticed that Mr. Ashley was sweating profusely, implying that the officer should have recognized that Mr. Ashley was suffering from excited delirium. This court has held that a detainee's mental health is part of the factual circumstances that the court considers under *Graham*. *See Aldaba v. Pickens*, 777 F.3d 1148, 1155 (10th Cir.), *petition for cert. filed*, 83 U.S.L.W. 3934 (U.S. June 17, 2015) (No. 14-1492). But Ms. Waters identifies no Supreme Court or Tenth Circuit decision existing in July 2011 that required officers to refrain from a minimal use of force when dealing with an impaired individual, particularly one who reportedly has committed a crime against another person. To the contrary, in a published decision in 2005, this court upheld the use of force against a man taking antidepressant medication, *see Phillips v. James*, 422 F.3d 1075, 1081, 1083 (10th Cir. 2005); in an unpublished decision in 2007, this court upheld the use of force against a woman with mental health problems, *see Giannetti v. City of Stillwater*, 216 F. App'x 756, 762-66 (10th Cir. 2007); and in a published decision in 2008, this court did not disapprove of the initial

10

use of force against a detainee who was apparently intoxicated and behaving bizarrely, *see Weigel v. Broad*, 544 F.3d 1143, 1148, 1155 (10th Cir. 2008).[2]

The district court also noted that Officer Jones' use of force "appears to have triggered Mr. Ashley's response and the escalation in force to subdue him." Aplt. App., Vol. IV at 538. It is (and was) clear, however, that the totality of the circumstances matter and "[t]he reasonableness standard does not require that officers use alternative less intrusive means." *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) (internal quotation marks omitted). Moreover, "in order to constitute excessive force, the conduct arguably creating the need for force . . . must rise to the level of recklessness, rather than negligence." *Id.* at 1132. Given what occurred previously, Ms. Waters identifies no decisions indicating that grabbing a suspect's arms when he is approaching an officer rises to the level of recklessness.

Next we consider the escalation in force. The key fact here is that while Officer Jones was applying force, Mr. Ashley was resisting being taken into custody. In several cases decided before 2011, this court upheld use of force by officers who

---

[2] As discussed below with regard to Officer Coleman, *Weigel* involved a protracted struggle between a detainee and two state troopers in which the detainee was kept under restraint even after being subdued. 544 F.3d at 1148-49. This court ultimately held that the troopers were not entitled to qualified immunity because a reasonable jury could conclude that the continued restraint, after the detainee was under control, was excessive. *See id.* at 1153, 1155. But the court "acknowledge[d] that, up to a point, the troopers were protecting themselves and the public from [the detainee] and [the detainee] from himself." *Id.*; *see also id.* (Hartz, J., concurring) ("I do not think that the defendants violated [the detainee's] constitutional rights before his legs were bound."); *id.* at 1156 (O'Brien, J., dissenting) ("[The decedent's] acts, not those of these troopers, escalated the violence to an extremely dangerous level. His behavior fully justified the restraints employed as well as their duration.").

11

faced physical resistance, including against persons who were impaired. *See Weigel*, 544 F.3d at 1148, 1155 (tackling to ground, chokehold); *Gallegos*, 114 F.3d at 1030-31 (tackling to ground); *Hinton*, 997 F.2d at 781, 782 (wrestling to ground and using stun gun); *Giannetti*, 216 F. App'x at 760, 762, 765 (struggle in which multiple officers held detainee's legs, arms, head, and held her back down); *see also Aldaba*, 777 F.3d at 1158 ("In cases where the subject actively resisted a seizure, whether by physically struggling with an officer or by disobeying direct orders, courts have held either that no constitutional violation occurred or that the right not to be tased in these circumstances was not clearly established."). Further, the pre-2011 cases holding that force may have been excessive tend to emphasize a detainee's *lack* of resistance. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665-66 (10th Cir. 2010); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007). In light of these decisions, it would not have been clear to a reasonable officer that the conduct at issue might be unlawful in these circumstances. At best, the facts place the case in the "hazy border between excessive and acceptable force." *Brosseau*, 543 U.S. at 201 (internal quotation marks omitted).

For these reasons, we conclude that in July 2011 it was not clearly established that the force used by Officer Jones could be considered excessive. Officer Jones is entitled to qualified immunity.

**D.    Officer Coleman**

The district court held that Officer Coleman's conduct could be unconstitutional and that the law was clearly established by *Weigel*, 544 F.3d at 1152.

12

As with Officer Jones, we need not decide whether Officer Coleman violated Mr. Ashley's constitutional rights because the law was not clearly established.

The district court found sufficient evidence to support the following facts with regard to Officer Coleman. The struggle had already begun when Officer Coleman arrived. When he arrived, Officer Jones and three zoo employees were holding Mr. Ashley on the ground. Officer Coleman perceived that Mr. Ashley continued to resist; at the least, he was flailing his arms. After Officer Coleman's arrival, Officer Jones deployed his Taser on Mr. Ashley's side. During the struggle, Officer Coleman deployed his Taser twice. In his opinion, "Mr. Ashley seemed extremely strong," and he heard Mr. Ashley say "something to the effect of 'help me Grandma. I don't want to go.'" Aplt. App., Vol. IV at 539 (internal quotation marks omitted). The district court stated that these were "both signs of a physiological condition known as excited delirium" and that officers receive training on how to recognize the symptoms of excited delirium and respond appropriately. *Id.*

In light of these facts, then, the question is whether case law existing as of July 2011 would alert any reasonable officer that it would be excessive force to join in a struggle between an officer and civilians on the one hand and a detainee on the other hand and to deploy a Taser twice, where the detainee appears to be resisting but may be suffering from excited delirium. We conclude that the law in this circuit as of July 2011 would not have put a reasonable officer on notice that such conduct could be considered excessive.

13

Again, the key fact is that the struggle was ongoing when Officer Coleman applied the force that is complained of. Officer Coleman perceived that Mr. Ashley seemed very strong and continued to resist. Therefore, the cases cited above with regard to Officer Jones also support applying qualified immunity to Officer Coleman. Moreover, even if the officer was mistaken in his belief that Mr. Ashley was resisting, the belief was not unreasonable under the circumstances. It is well-established that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back the officer would be justified in using more force than in fact was needed." *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (ellipsis and internal quotation marks omitted).

In discussing the state of the law, the district court relied solely on *Weigel*:

[I]n *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) an officer "applied pressure to [the decedent's] upper body, including his neck and shoulders, by using either one or both knees and his hands" despite [the facts that] the decedent's "apparent intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxiation." *Id.* at 1152, 1148. There, the Tenth Circuit reversed the district court's grant of summary judgment in favor of the defendant because holding the decedent in this manner "was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions." *Id.* at 1155.

The incident at issue here occurred in July 2011, nearly three years after the Tenth Circuit decided *Weigel*. Accordingly there was sufficient precedent to put the Defendants on notice that a reduced use of force is appropriate for an individual suffering from excited delirium.

Aplt. App., Vol. IV at 544-45 (footnote omitted). What the district court failed to recognize, however, is that this court did not consider all the force in *Weigel*

14

unconstitutional. Rather, if the *Weigel* plaintiffs' version of the facts were proved, a constitutional use of force evolved into excessive force.

During the first phase of the incident in *Weigel*, the detainee was struggling with officers. This court did not consider this initial use of force unconstitutional; rather, we recognized that "up to a point, the troopers were protecting themselves and the public from [the detainee] and [the detainee] from himself." *Weigel*, 544 F.3d at 1155; *see also id.* (Hartz, J., concurring) ("I do not think that the defendants violated [the detainee's] constitutional rights before his legs were bound."); *id.* at 1156 (O'Brien, J., dissenting) ("[The detainee's] acts, not those of these troopers, escalated the violence to an extremely dangerous level. His behavior fully justified the restraints employed as well as their duration."). During the second phase, the detainee was subdued and under control, yet officers continued to apply pressure to his back for a significant period after he was no longer a threat and no longer struggling. *Id.* at 1152. The second-phase behavior was what this court held could be considered to be excessive force. *See id.* at 1152-53, 1155.

Officer Coleman's actions occurred before Mr. Ashley was restrained and therefore his conduct is analogous to *Weigel*'s first phase, not its second phase. Accordingly, *Weigel* does not clearly establish that Officer Coleman's actions could be considered excessive.[3]

---

[3] With regard to Officers Coleman and Gasca and Lieutenant Conner, Ms. Waters also relies on *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001). The conduct at issue in *Cruz* was "the tying of the decedent's arms behind his back,

(continued)

For these reasons, we conclude that in July 2011 it was not clearly established that the force used by Officer Coleman could be considered excessive in these circumstances. Officer Coleman is entitled to qualified immunity.

## E.    Lieutenant Conner

Ms. Waters sued Lieutenant Conner both for his hands-on participation in the struggle and his supervisory conduct.

### 1.    Hands-On Participation

The district court concluded that there was a fact issue as to the constitutionality of Lieutenant Conner's hands-on participation. It did not make a separate state-of-the-law analysis but instead addressed the state of the law as to him and Officers Coleman and Gasca together. Thus, as discussed above, the district court relied solely on *Weigel* to hold that the law was clearly established. We need not address the constitutionality of Lieutenant Conner's hands-on participation, because the law was not clearly established.

The district court found sufficient evidence to support the following facts with regard to Lieutenant Conner's hands-on participation. After Lieutenant Conner got to the zoo, but before he reached the struggle, he heard the sound of a Taser being deployed. When he arrived on the scene he saw Mr. Ashley lying on his side with

binding his ankles together, securing his ankles to his wrists, and then placing him face down on the ground." *Id.* at 1188. This conduct is not analogous to the force employed by Officer Coleman or Lieutenant Conner. *Cruz* is more analogous to Officer Gasca's post-handcuffing conduct. But as discussed below, we lack jurisdiction to consider the denial of qualified immunity for post-handcuffing conduct, and so we need not discuss *Cruz*.

16

Officers Jones and Coleman and two zoo employees holding him down. He joined the struggle by applying his OPN to Mr. Ashley's legs, but was unsuccessful; Mr. Ashley showed no reaction to the pain-compliance technique. Lieutenant Conner then assisted a zoo employee with handcuffing Mr. Ashley's right wrist and helped control Mr. Ashley's left arm so the left wrist could be handcuffed. During the struggle he noticed that Mr. Ashley had "super human strength" and he believed Mr. Ashley "was under some type of intoxication or maybe excited delirium." Aplt. App., Vol. IV at 540 (internal quotation marks omitted).

The question then is whether case law existing as of July 2011 would alert any reasonable officer that it would be excessive force to join in a struggle between two officers and civilians on the one hand and a detainee on the other hand, to apply an OPN, and to hold the detainee's arms and assist in handcuffing, where the detainee appears to be resisting but may be intoxicated or suffering from excited delirium.

Again, the key fact is that the struggle was ongoing when Lieutenant Conner applied the complained-of force. Lieutenant Conner perceived that Mr. Ashley exhibited no reaction to pain-compliance measures and had superhuman strength given his size. Therefore, the body of case law cited above with regard to Officers Jones and Coleman again supports granting qualified immunity to Lieutenant Conner for his hands-on participation in the struggle. Further, for the reasons discussed above with regard to Officer Coleman, *Weigel* does not clearly establish the law with regard to this stage of the incident.

For these reasons, we conclude that in July 2011 it was not clearly established that Lieutenant Conner's hands-on conduct could be considered excessive in these circumstances. Lieutenant Conner is entitled to qualified immunity for his hands-on participation in the struggle.

### 2. Supervisory Conduct

Lieutenant Conner was the ranking officer on the scene. After Mr. Ashley was handcuffed, he summoned medical assistance and directed other officers in the performance of their duties. The district court allowed a claim against him in his supervisory capacity to proceed because "[d]espite being a supervisory officer and recognizing that Mr. Ashley was experiencing excited delirium, Officer Conner testified that he did not intervene when the other officers continued to hold Mr. Ashley on his stomach for between two and five minutes after being handcuffed." Aplt. App., Vol. IV at 545; *see Booker*, 745 F.3d at 421 ("[W]e have . . . denied qualified immunity when an officer failed to prevent others from using excessive force even though the officer himself did not engage in excessive force.").

Lieutenant Conner's argument regarding his supervisory conduct essentially challenges the district court's factual findings. Particularly, he argues that there is no showing that he failed to intervene in the use of excessive force by any other officer. But the district court concluded otherwise. Accordingly, we lack jurisdiction to consider the denial of qualified immunity for Lieutenant Conner's post-handcuffing

18

supervisory conduct. *See Fancher*, 723 F.3d at 1199-1200. We dismiss this portion of Lieutenant Conner's appeal.

**F.    Officer Gasca**

As with Lieutenant Conner, the district court concluded that there was a fact issue as to the constitutionality of Officer Gasca's conduct. And as with Officer Coleman and Lieutenant Conner, the court concluded that *Weigel* clearly established the law. We reverse the district court's decision in part and dismiss Officer Gasca's appeal in part.

The district court found sufficient evidence to support the following facts with regard to Officer Gasca's conduct. When Officer Gasca arrived, he saw two people with their knees on Mr. Ashley's shoulders. He also perceived that Mr. Ashley had vomited. He restrained Mr. Ashley's legs by crossing Mr. Ashley's ankles, bent his knees back, put his ankles to his buttocks and kneeled on them; in an alternate description, the district court stated that he "used body weight to keep Mr. Ashley on his stomach and to press his legs into his back." Aplt. App., Vol. IV at 541. Officer Gasca "remained in this position for several minutes after Mr. Ashley was handcuffed." *Id.* Officer Gasca perceived the various signs of excited delirium already mentioned: his strength, he was sweating profusely, and the officers could not control him.

For the reasons discussed above, if Officer Gasca applied the complained-of force in an effort to control Mr. Ashley while he was resisting arrest and struggling with officers, the law would not have been clearly established and Officer Gasca is

19

entitled to qualified immunity. Although the district court's order is somewhat equivocal, it stated that "Officer Gasca joined the struggle," *id.*; it weighed the first *Graham* factor in favor of Officer Gasca, as it did with Officer Coleman and Lieutenant Graham; and it noted Officer Gasca's perception that officers could not control Mr. Ashley. It also explicitly found that Officer Gasca's restraint of Mr. Ashley's legs continued after he was handcuffed. Therefore, we understand the district court to have found that Mr. Ashley had not been handcuffed and continued to act in a manner indicating he was resisting arrest at the time Officer Gasca arrived. In those circumstances, consistent with our discussion of the other officers' conduct, the law was not clearly established that Officer Gasca's actions before Mr. Ashley was handcuffed could be considered excessive force. He is entitled to qualified immunity for his conduct up to that point. Accordingly, the district court's denial of qualified immunity is reversed to the extent it applies to force Officer Gasca used before Mr. Ashley was handcuffed.

The district court, however, explicitly found that the evidence would support a determination that Officer Gasca continued to restrain Mr. Ashley's legs, while he was in a prone position, for several minutes *after* he was handcuffed. And the district court found that there was evidence that Officer Gasca did so after perceiving that Mr. Ashley had vomited and that he had exhibited symptoms of excited delirium. These findings are analogous to the force considered potentially excessive in *Weigel*, 544 F.3d at 1153 ("[T]here is evidence that for three minutes the troopers subjected [the detainee] to force that they knew was unnecessary to restrain him and that a

20

reasonable officer would have known presented a significant danger or asphyxiation and death."). Officer Gasca's argument that he is entitled to qualified immunity rests on the fact that Mr. Ashley was struggling when he arrived; he does not address the findings regarding his post-handcuffing conduct. Thus, as to the portion of the proceedings beyond the point that Mr. Ashley was handcuffed, Officer Gasca's argument implicitly "depends upon a challenge to the facts the district court concluded a reasonable jury could infer based upon the evidence in the summary judgment record." *Fancher*, 723 F.3d at 1199. This court therefore lacks jurisdiction to consider the denial of qualified immunity for Officer Gasca's post-handcuffing conduct. *See id.* at 1199-1200. This portion of Officer Gasca's appeal is dismissed.

### III. CONCLUSION

We reverse the district court's decision denying qualified immunity to (1) Officer Jones, (2) Officer Coleman, (3) Lieutenant Conner for his hands-on participation in the struggle with Mr. Ashley, and (4) Officer Gasca for his participation in the struggle before Mr. Ashley was handcuffed, and we remand with instructions to grant qualified immunity on the excessive-force claims in accordance with this decision. We dismiss the appeal as to the denial of qualified immunity (1) to Officer Gasca for his conduct after Mr. Ashley was handcuffed, and (2) to Lieutenant Conner for his supervisory conduct after Mr. Ashley was handcuffed.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

21