**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 4, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ERMA ALDABA, as personal
representative and next of kin to Johnny
Manuel Leija, deceased,

        Plaintiff - Appellee,

v.

BRANDON PICKENS; JAMES ATNIP;
STEVE BEEBE,

        Defendants - Appellants,

    and

THE BOARD OF MARSHALL
COUNTY COMMISSIONERS; THE
CITY OF MADILL,

        Defendants.

Nos. 13-7034 & 13-7035

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 6:12-CV-00085-FHS)**

---

Philip W. Anderson of Collins, Zorn & Wagner, P.C., Oklahoma City, Oklahoma and
Eric D. Janzen of Steidley & Neal, P.L.L.C., Tulsa, Oklahoma, for
Defendants–Appellants.

Jeremy Beaver of Gotcher & Beaver Law Firm, McAlester, Oklahoma, for
Plaintiff–Appellee.

---

Before **BRISCOE**, Chief Judge, **McKAY** and **PHILLIPS,** Circuit Judges.

**McKAY**, Circuit Judge.

Plaintiff Erma Aldaba brought this 42 U.S.C. § 1983 action on behalf of her deceased son, Johnny Manuel Leija, who died after an altercation with Appellants—Officer Brandon Pickens and Deputies James Atnip and Steve Beebe—in the Oklahoma hospital where he was being treated for pneumonia. Plaintiff brought several claims against various defendants, including Appellants. The district court granted summary judgment in favor of the defendants as to all claims except Plaintiff's claim of excessive force against Appellants. As for this claim, the district court denied Appellants' request for summary judgment on the grounds of qualified immunity, holding there were numerous fact issues regarding the reasonableness of the officers' conduct that prevented summary judgment. Appellants then filed this interlocutory appeal.

**I.**

When reviewing an interlocutory appeal from the denial of qualified immunity, "we 'take, as given, the facts that the district court assumed when it denied summary judgment.'" *Morris v. Noe*, 672 F.3d 1185, 1189 (10th Cir. 2012) (quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)). We accordingly rely on the district court's description of the facts, taken in the light most favorable to Plaintiff, and do not reevaluate the district court's conclusion that the summary judgment record is sufficient to prove these facts. *Id.*

On March 24, 2011, Mr. Leija went to the hospital and was diagnosed with dehydration and severe pneumonia in both lungs. His pneumonia was causing hypoxia—low oxygen levels—which can affect an individual's mental state. When Mr. Leija was admitted to the hospital at 11:00 a.m., he was pleasant, cooperative, and responsive. He was placed on oxygen and given breathing treatments and intravenous antibiotics, and his oxygen saturation level improved. By 6:00 p.m., however, Mr. Leija's behavior had changed. He complained of extreme thirst, and a female nurse found that he had disconnected his oxygen and cut his intravenous tube. The nurse also saw that Mr. Leija was bleeding from his arms and that there was blood on the floor and the toilet. Although the nurse reconnected Mr. Leija's oxygen and IV, he seemed confused and anxious, repeatedly asking for his girlfriend. The nurse reported this to the doctor who had seen Mr. Leija earlier in the day. The doctor prescribed Xanax to control Mr. Leija's anxiety, but when the nurse attempted to give Mr. Leija the medication, he refused to take it and accused the nurse of telling him lies and secrets. Mr. Leija became increasingly uncooperative and aggressive, shouting that the staff was trying to poison him.

The female nurse contacted the doctor again for assistance, and the doctor sent a male nurse to Mr. Leija's room. The male nurse discovered Mr. Leija had again removed his oxygen and IV and was now yelling, "I am Superman. I am God. You are telling me lies and trying to kill me." (Appellant's App. at 80.) The male nurse tried to persuade Mr. Leija to calm down and get back in his bed, but Mr. Leija refused. Mr. Leija's doctor was contacted, and he directed the nurse to give Mr. Leija an injection of Haldol and

-3-

Ativan in order to calm him down. However, Mr. Leija refused this medication as well, insisting that only water was pure enough to help him. The male nurse did not believe he and the doctor could restrain Mr. Leija in order to administer the injection. Accordingly, with the doctor's approval, the nurse called law enforcement at 6:36 p.m. "for assistance with a disturbed patient." (*Id.* at 106.) Officer Pickens received the call for assistance while he was eating dinner with Deputies Atnip and Beebe, and the other two officers agreed to go to the hospital with him.

Meanwhile, the doctor arrived at Mr. Leija's room to assist the nurses. He heard Mr. Leija state that the medical staff was trying to poison him, that he was God and Superman, and that only water was pure enough for him. The doctor became increasingly concerned for Mr. Leija's health given the behavioral and personality changes in Mr. Leija from earlier in the day when he was admitted.

Mr. Leija subsequently exited his room in his hospital gown and began walking down the hall. The three police officers arrived at the scene at about this time and observed Mr. Leija standing in the hall, visibly agitated and upset. Medical personnel informed Officer Pickens that Mr. Leija was ill and could die if he left the hospital. Officer Pickens attempted to persuade Mr. Leija to return to his room, but Mr. Leija refused, insisting that the staff was trying to kill him. Officer Pickens assured him that no one was trying to kill him, but Mr. Leija continued down the hallway toward the lobby area. At some point, Mr. Leija stopped, pulled out the IV ports on his arms, and said, "This is my blood," as he clenched and shook his fists. (*Id.* at 290.)

-4-

Deputies Atnip and Beebe testified (and the district court apparently assumed) that they repeatedly ordered Mr. Leija to calm down and get down on his knees, but Mr. Leija did not comply, even after they warned him several times they would use a taser. When Mr. Leija failed to comply with their commands, Deputy Beebe fired his taser at Mr. Leija, striking him in the upper torso with one of the two probes. The taser appeared ineffectual, however, and a struggle ensued. Deputy Atnip grabbed Mr. Leija's right forearm while Officer Pickens took his left arm. The officers thrust Mr. Leija face-first against a wall, at which point Deputy Beebe tased him again on the back of the shoulder with a "dry" sting, which causes direct contact with the electrical probes without launching the penetrating barbs. This second taser shot appeared ineffectual as well, but Deputy Atnip pushed his leg into the back of Mr. Leija's knee, causing it to buckle. As the four men fell to the floor, Mr. Leija continued to resist, falling face-down while Deputy Atnip and Officer Pickens struggled with his arms. Deputy Beebe managed to place a handcuff on Mr. Leija's right arm as Officer Pickens kept hold of his left, allowing the male nurse to administer the injection of Haldol and Ativan. At this point, however, Mr. Leija went limp, made a grunting sound, and vomited clear fluid. The officers moved away from Mr. Leija, and medical personnel immediately began CPR. The efforts to revive Mr. Leija failed, however, and he was pronounced dead at 7:29 p.m.

The medical examiner determined Mr. Leija's cause of death to be respiratory insufficiency secondary to pneumonia, with the manner of death being natural. The medical examiner testified the taser shots "certainly could" have increased Mr. Leija's

-5-

need for oxygen (*id.* at 332), and he further testified the exertion caused by Mr. Leija's physical struggle with the officers "exacerbated his underlying pneumonia" (*id.* at 333). Mr. Leija's treating physician also testified that placing a man in the prone position with his hands cuffed behind his back could compromise his body's ability to inhale and get oxygen.

The district court held that Mr. Leija was lawfully seized, since probable cause existed for taking him into protective custody based on his mental incompetence and the threat he posed to his own health. The court accordingly granted summary judgment in favor of the law enforcement officers on Plaintiff's unlawful seizure claim. However, the court held that the officers were not entitled to qualified immunity on Plaintiff's excessive force claim. The court held that there were several material disputed facts relating to the objective reasonableness of the force the officers applied to seize Mr. Leija. "Primarily, the record is in dispute as to the *degree* of resistance exhibited by Leija after being confronted by the officers." (*Id.* at 442.) The court noted the hospital surveillance footage of the encounter between Mr. Leija and the officers showed Mr. Leija simply walking away from the officers. The officers contended Mr. Leija began acting more aggressively after he moved out of the frame of the surveillance video. However, "[t]he gap in the video recording results in a failure to have an objective viewing of what transpired after the time Leija walked away from the officers and up until the point where the officers are seen apprehending Leija [after he had already been tased and grabbed by the officers]." (*Id.* at 443.) The court also held that "[t]he testimony of the officers is not

consistent as to the nature of the aggressive behavior of Leija during this critical gap in the video." (*Id.*) The court thus held that there was a material dispute of fact as to the nature and degree of Mr. Leija's resistance to the officers' attempts to seize him. The district court further concluded that the record was in dispute as to the threat Mr. Leija allegedly posed to the officers or the public, since he was an unarmed hospital patient and, while there was an allegation that he was using his blood as a weapon, there was no evidence that any of his blood was spattered on any of the officers. Finally, the court concluded there was a material dispute as to "[t]he officers' knowledge of [Mr. Leija's serious medical] condition—and their efforts to ascertain information about Leija's condition before attempting to use any degree of force on him." (*Id.*) The district court concluded that all of these material disputed facts precluded the issuance of summary judgment in favor of Appellants on Plaintiff's excessive force claim. This interlocutory appeal followed.

## II.

We review the district court's denial of summary judgment on qualified immunity grounds de novo, with our review limited to purely legal issues. *Morris*, 672 F.3d at 1189. Based on the facts identified by the district court, we thus consider de novo the purely legal questions of "whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation" and "whether that law was clearly established at the time of the alleged violation." *Allstate Sweeping, LLC v. Black*, 706

F.3d 1261, 1267 (10th Cir. 2013).[1]

## A. Constitutional Violation

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." The Court then held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). This balancing test "requires careful attention to the facts and circumstances of

---

[1] The dissent concludes that this court may conduct its own factual review of the record in order to identify additional facts that the district court would be likely to find for summary judgment purposes However, appellate review of the evidence in the record should be the exception, not the rule, in qualified immunity cases. *See Johnson*, 515 U.S. at 319. We may need to conduct an evidence-based review of the record when the district court opinion on appeal is so cursory that we cannot determine what facts the court relied on in denying summary judgment. *See Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996) (concluding that the appellate court would need to conduct a factual review of the record where the district court simply stated that it was denying summary judgment "on the ground that 'material issues of fact remain'" (brackets omitted)). In the case before us, however, the district court's ruling was fully explained. We accordingly will not embark on our own fact-finding expedition into the evidence, particularly not in a manner that would call the district court's own factual determinations into question and resolve factual disputes in favor of the officers, rather than Plaintiff. Following our established practice, we take as given the district court's statement of the facts and its conclusion that the facts are in dispute on several material questions, including the threat Mr. Leija allegedly posed to others in the hospital and the degree and type of resistance he demonstrated in the moments preceding his tasing by the officers.

each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

In determining whether an officer's use of force was excessive, many cases have focused solely on the three factors specifically described in *Graham*. *See, e.g.*, *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007). However, these three factors were not intended to be exclusive, and the circumstances of a particular case may require the consideration of additional factors. This is especially true where a Fourth Amendment excessive-force claim arises out of a protective custody seizure rather than a criminal arrest, since the *Graham* factors are tailored to the criminal context and are unlikely to cover all of the pertinent circumstances in a protective custody case.

For instance, while the three factors listed in *Graham* may be sufficient to evaluate the "governmental interests at stake" in a typical criminal arrest case, *see Graham*, 490 U.S. at 396, an additional governmental interest may be implicated in cases involving protective custody seizures—the governmental interest in preventing a mentally disturbed

individual from harming himself.  *See Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996)

("The state has a legitimate interest . . . in protecting a mentally ill person from self-

harm.).  The need to protect such persons from themselves is thus an additional factor that

may weigh into our evaluation of the reasonableness of a particular use of force in such

cases.  Just as the weight of the second *Graham* factor varies based on the threat the

subject poses to police officers and others, the weight of this additional factor will vary

based on the severity and immediacy of the threat the individual poses to himself.  When

an individual poses a more severe and immediate threat to himself, a higher level of force

may be reasonable in order to seize him for protective custody purposes.

Two more additional factors may also be pertinent in determining the

reasonableness of the force used for a seizure, particularly in the protective custody

context.  First, as we have previously acknowledged, "a detainee's mental health must be

taken into account when considering the officers' use of force[,] and it is therefore part of

the factual circumstances the court considers under *Graham*."  *Giannetti v. City of

Stillwater*, 216 F. App'x 756, 764 (10th Cir. 2007).  The Ninth Circuit has explained why

an individual's mental or emotional disturbance should be considered in determining the

reasonableness of a particular use of force:

> The problems posed by, and thus the tactics to be employed against, an
> unarmed, emotionally distraught individual who is creating a disturbance or
> resisting arrest are ordinarily different from those involved in law
> enforcement efforts to subdue an armed and dangerous criminal who has
> recently committed a serious offense.  In the former instance, increasing the
> use of force may, in some circumstances at least, exacerbate the situation; in
> the latter, a heightened use of less-than-lethal force will usually be helpful

in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual. . . . [W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.

*Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001) (citations and footnotes omitted). This factor will weigh against the use of force most strongly where the mentally disturbed individual has committed no crime and poses a threat only to himself, since a seizure by force may well undermine the sole governmental interest supporting the seizure in such a case—the interest in protecting the mentally disturbed individual from harming himself. As the Ninth Circuit has noted, when "a mentally disturbed individual not wanted for any crime . . . [i]s being taken into custody to prevent injury to himself[, d]irectly causing him grievous injury does not serve that objective in any respect." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003).

Second, the reasonableness of a particular use of force depends in part on whether the law enforcement officers knew or should have known that the individual had special characteristics making him more susceptible to harm from this particular use of force. For instance, in *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001), we found the use of hog-tie restraints to be unreasonable when officers know or should be on notice

-11-

that the subject has diminished capacity and is accordingly more likely to experience positional asphyxia from the use of such restraints. We explained:

> We do not reach the question whether all hog-tie restraints constitute a constitutional violation per se, but hold that officers may not apply this technique when an individual's diminished capacity is apparent. This diminished capacity might result from severe intoxication, the influence of controlled substances, a discernible mental condition, or any other condition, apparent to the officers at the time, which would make the application of a hog-tie restraint likely to result in any significant risk to the individual's health or well-being. In such situations, an individual's condition mandates the use of less restrictive means for physical restraint.

*Id.* at 1188. This factor is particularly pertinent when the reason for seizing an individual is to ensure he receives the necessary medical treatments for his compromised physical condition. In such a case, law enforcement officers should be especially sensitive to the likelihood that a particular use of force may do more harm than good. We note in particular that the use of tasers and similar electronic control devices may be counterproductive, at best, to the goal of ensuring that a mentally and medically compromised individual is restored to health. *See Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 948 n.6 (9th Cir. 2012) (noting that a 2009 notice issued by Taser International warned law enforcement officers using electronic control devices "to pay special attention to 'physiologically or metabolically compromised' suspects, including those with cardiac disease and the effects of drugs," since their bodies are at a greater risk of harm from such devices).

These three additional factors, as well as the three *Graham* factors, are all pertinent to our analysis of the law enforcement officers' seizure of Mr. Leija in this case. We

consider all of these factors in order to "careful[ly] balanc[e] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake" as required by *Graham*, 490 U.S. at 396.

The first additional factor applicable to this case—the severity and immediacy of the threat Mr. Leija posed to himself—weighs in favor of the application of some force, if necessary, in order to protect Mr. Leija from the threat he posed to himself. According to the facts identified by the district court, Officer Pickens was informed that Mr. Leija could die if he left the hospital, and Mr. Leija was clearly delusional and mentally disturbed. Mr. Leija thus posed both an immediate and a severe threat to himself, and the government had an interest in seizing Mr. Leija in order to ensure he received the necessary medications he was refusing as a result of his disturbed mental state.

However, the other additional factors pertinent to this case weigh against the level of force employed here, and particularly against the officers' use of a taser. Mr. Leija was clearly delusional and mentally disturbed, which weighs against the reasonableness of the officers' decision to employ such a severe level of force against him. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010) ("Although Tasers may not constitute deadly force, their use unquestionably 'seizes' the victim in an abrupt and violent manner," making the nature and quality of the intrusion on the victim's Fourth Amendment interests "quite severe."). When faced with a mentally ill individual, a reasonable police officer should make a "greater effort to take control of the situation through less intrusive means." *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010).

-13-

> A mentally ill individual is in need of a doctor, not a jail cell . . . . [T]he purpose of detaining a mentally ill individual is not to punish him, but to help him. The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs in both degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.

*Id.* (internal quotation marks omitted). The situation the police officers faced in this case called for conflict resolution and de-escalation, not confrontation and tasers.

Mr. Leija's compromised physical condition also weighs against the types of force employed in this case. A use of force that might be reasonable against an apparently healthy individual may be unreasonable when employed against an individual whose diminished capacity should be apparent to a reasonable police officer. *See Cruz*, 239 F.3d at 1188. Here, taking the facts in the light most favorable to Plaintiff, the officers were on notice that Mr. Leija was gravely ill and thus was very likely to have diminished capacity. This factor thus weighs against the reasonableness of the officers' decision to tase and wrestle to the ground a hospital patient whose mental disturbance was the result of his serious and deteriorating medical condition.

Furthermore, the first two *Graham* factors weigh against the use of force in this case. Taking the facts in the light most favorable to Plaintiff, Mr. Leija did not commit any crime, much less a severe crime, and he posed no threat to the police officers or anyone else. Thus, the only governmental interest weighing in favor of the use of force in this case is the interest in protecting Mr. Leija from the threat he posed to himself, as discussed above.

Finally, the third *Graham* factor also weighs against the officers' actions in this case. Under this factor, a higher level of force may be employed when the subject is actively resisting or attempting to evade arrest by flight. In cases where the subject actively resisted a seizure, whether by physically struggling with an officer or by disobeying direct orders, courts have held either that no constitutional violation occurred or that the right not to be tased in these circumstances was not clearly established. *See, e.g.*, *Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993) (finding no violation where subject refused to talk to police after they asked him to stop, shoved an officer, and was tased during the ensuing struggle); *see also Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012) (collecting cases). Conversely, when officers tased a subject who was detained or not exhibiting active resistance, courts have typically allowed an excessive force claim to proceed. *See, e.g.*, *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 759-60 (10th Cir. 2013) (affirming denial of qualified immunity where detained subject alleged she was tased after telling officers that she was physically incapable of complying with their command to place her feet outside police cruiser and officers made no attempt to help her); *see also Cockrell*, 468 F. App'x at 496 (collecting cases).

Here, Deputies Atnip and Beebe claimed that Mr. Leija refused to comply with their orders to calm down and get on his knees, even after they warned him that he would be tased. Ms. Aldaba disputes that any such orders or warnings were rendered, but we must "take, as given, the facts that the district court assumed when it denied summary judgment," *Morris*, 672 F.3d at 1189 (internal quotation marks omitted). Moreover,

-15-

based on all of the facts, we can at least infer that Mr. Leija knew the police were there to coax him back into his room for treatment and that he resisted in this regard. Indeed, the hospital surveillance video shows that just after he exited his room, Mr. Leija waved off Officer Pickens and slowly walked away, signaling that he understood the officers wanted him to return to his room. As the officers contend, these facts indicate some level of resistance. However, viewing the facts in Plaintiff's favor, nothing suggests Mr. Leija's resistance was anything more than passive. *See Bryan*, 630 F.3d at 830 ("Resistance . . . should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." (internal quotation marks omitted)); *see also Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) ("[W]e draw a distinction between a failure to facilitate an arrest and active resistance to arrest."). The analysis thus turns to whether the officers' use of force was commensurate with Mr. Leija's level of resistance.

In that regard, Deputy Beebe made the initial showing of force by tasing Mr. Leija. The surveillance video does not capture the first taser strike, but Deputy Atnip and Officer Pickens can be seen moments later grabbing Mr. Leija's arms and pushing him against a wall. Deputy Beebe then tases Mr. Leija a second time before the officers bring him to the floor and attempt to handcuff him. On appeal, the parties raise several arguments regarding the struggle that followed the initial taser strike. However, we need not address these arguments because we conclude that Plaintiff has sufficiently

-16-

demonstrated an excessive force violation based on the officers' initial decision to tase

Mr. Leija, which precludes summary judgment in favor of Appellants on Plaintiff's

excessive force claim.[2]

Taking the facts in the light most favorable to Plaintiff, Deputy Beebe was not

justified in tasing Mr. Leija as an initial use of force given the resistance he was

exhibiting up to that point and the fact that the only governmental interest supporting the

seizure was the interest in protecting Mr. Leija from the threat he posed to himself. *See*

*Abbott v. Sangamon Cnty.*, 705 F.3d 706, 730 (7th Cir. 2013) (holding that passive

non-compliance without active resistance does not justify substantial escalation of force);

*cf. Hinton*, 997 F.2d at 781 (finding no violation where officers first grabbed

non-compliant subject and then used stun-gun after the subject began actively and openly

resisting officers' attempts to handcuff him).  Moreover, while Officer Pickens and

Deputy Atnip did not themselves tase Mr. Leija, it is clearly established in this circuit that

"[a]n officer who fails to intervene to prevent a fellow officer's excessive use of force

may be liable under § 1983." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).

---

[2] The reasonableness of the initial taser strike is pertinent to the reasonableness of the officers' subsequent actions, since the "totality of the circumstances" analysis includes consideration of "whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (internal quotation marks and brackets omitted).  Because we affirm the district court's denial of summary judgment based on the initial taser strike, we need not resolve the question of whether the officers' subsequent actions would likewise constitute excessive force.  The jury can appropriately resolve this and other remaining factual disputes regarding Plaintiff's excessive force claim on remand.

Thus, Officer Pickens and Deputy Atnip may be found liable for their decision not to intervene after it became clear that Deputy Beebe intended to tase Mr. Leija.

Taking the facts in the light most favorable to Plaintiff, a jury could find that Appellants violated Mr. Leija's constitutional rights by employing such a severe level of force against him despite their knowledge of his mental instability, his serious medical condition, and the fact that he had committed no crime and posed a threat only to himself. We accordingly affirm the district court's conclusion that Appellants are not entitled to summary judgment on Plaintiff's excessive force claim.

## B.  Clearly Established Law

Having held that the alleged facts regarding the initial taser strike would be sufficient to establish an excessive force claim, we must turn to the question of whether the law was clearly established at the time of the alleged violation. *See Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1267 (10th Cir. 2013).  Under *Graham*, the analysis of an excessive-force claim is necessarily fact-specific, and thus prior cases do not need to involve all of the same factual circumstances or factors in order for an excessive force violation to be clearly established.  *See Casey*, 509 F.3d at 1284.  Rather, we use a sliding scale in which "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Morris*, 672 F.3d at 1196 (internal quotation marks omitted).

In several previous cases, we have examined the reasonableness of taser use in

general without discussing the specific ramifications of law enforcement's use of tasers against the mentally and physically ill. On one end of the spectrum, *Hinton* stands for the uncontroversial proposition that a misdemeanant who ignores an officer's orders to stop, shoves an officer, and then actively and openly resists arrest by, among other things, biting the officer, has no clearly established right not to be tased during the struggle. 997 F.2d at 781. At the other end of the spectrum, *Casey* clearly established that an officer could not tase a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands. 509 F.3d at 1281-82. Appellants argue that *Casey* is distinguishable because the officer in that case used a taser without a warning, while here Mr. Leija was warned he would be tased if he did not comply with the officers' demands. However, our decision in *Casey* was based on the conclusion that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Id.* at 1286. Thus, *Casey* does not stand for the proposition that it is reasonable for an officer to simply give a warning and then use a taser as the initial use of force against a non-violent, non-threatening misdemeanant. Rather, *Casey* establishes that only a lesser level of force may be employed against such an individual unless the individual begins actively resisting or fleeing, as the plaintiff did in *Hinton*. Under *Casey,* a warning is a necessary but not a sufficient part of the reasonableness analysis when a taser is used against a non-violent, non-threatening individual who has not committed a serious crime.

Consistent with our precedents, other courts that have examined the use of tasers against the mentally ill have found it clearly established that officers may not tase non-criminal, non-threatening subjects who primarily exhibit passive resistance. For example, in *Oliver v. Fiorino*, 586 F.3d 898, 901, 906-07 (11th Cir. 2009), the court found that as of 2004, a mentally unstable subject who flagged down an officer to falsely report a shooting had a clearly established right not to be tased where he was suspected of no crime, was largely compliant, and posed no immediate threat of danger to officers beyond one moment of struggle. Likewise in *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1203 (D. Colo. 2009), the court concluded that a mentally unstable woman had a clearly established right not to be tased in her own home without warning where she was suspected of no crime, posed no threat to officers or others, only resisted by refusing to allow the officers to enter her home. Finally, in *Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1249-50 (M.D. Ala. 2010), the court held that officers called to a hospital to assist with a "disturbed patient" who was loud, boisterous, and screaming could not tase the patient without warning while she was restrained to a gurney because she had committed no crime, was no longer a danger or threat, and was outnumbered.

These cases do not exactly mirror the factual circumstances of our case, but "the qualified immunity analysis involves more than 'a scavenger hunt for prior cases with precisely the same facts.'" *Cavanaugh*, 625 F.3d at 666 (quoting *Casey*, 509 F.3d at 1284). Instead, the "more relevant inquiry" for qualified immunity purposes is "whether the law put officials on fair notice that the described conduct was unconstitutional."

*Casey*, 509 F.3d at 1298.  Here, we conclude that *Graham*, *Casey*, *Cruz*, and the other pertinent authorities sufficiently put Appellants on notice that it is not objectively reasonable to employ a taser as the initial use of force against a seriously ill, non-criminal subject who poses a threat only to himself and is showing only passive resistance, regardless of whether they provide a warning first.  *Cf. Fogarty*, 523 F.3d at 1162 ("Considering that under [plaintiff's] version of events each of the *Graham* factors lines up in [her] favor, this case is not so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions.").

We emphasize that significant factual issues remain which must be resolved at trial, including whether Mr. Leija was slinging blood at the officers, whether the officers knew about the extent of Mr. Leija's illness, and whether he exhibited something more than passive resistance in the moments before he was tased.[3]  If those facts prove to be

---

[3] These disputes regarding the reasonableness of the initial taser strike will also be relevant to the analysis of whether the officers' subsequent actions were reasonable.  In this analysis, further factual disputes abound as to the severity of force employed by the officers and the degree of resistance displayed by Mr. Leija following the initial taser strike.

We note that a plaintiff may only recover on an excessive force claim if she shows "(1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional." *Cortez v. McCauley*, 478 F.3d 1108, 1129 n. 25 (10th Cir. 2007).  Depending on which, if any, of the officers' actions are found to constitute excessive force, the jury may need to resolve factual disputes regarding the cause of Mr. Leija's death and whether he sustained "some actual injury caused by the unreasonable seizure."  For instance, at that stage of the inquiry, the jury may need to resolve the factual dispute regarding whether the initial Taser strike actually caused an electrical shock or other injury to Mr. Leija.

different than those we have considered on the summary judgment record, the excessive force analysis may yield a different result. However, based on the facts taken in the light most favorable to Plaintiff, we conclude that Plaintiff can show a violation of clearly established law sufficient to defeat Appellants' request for qualified immunity

## III.

We accordingly **AFFIRM** the district court's denial of qualified immunity.

13-7034, 13-7035 *Aldaba v. Pickens, et al.*

**PHILLIPS**, Circuit Judge, dissenting:

I would conclude that the three officers did not act with excessive force under the Fourth Amendment. Accordingly, I would also conclude that they violated no clearly established law. I believe they are entitled to summary judgment on their qualified immunity defense.

This case presents a highly unusual encounter between a hospital patient not in his right mind and three law enforcement officers responding to a distress call from his medical providers, who sought help restraining him so they could treat his deteriorating, life-threatening medical condition. Despite the tragic death of Mr. Leija, I believe the officers acted reasonably in confronting a difficult emergency situation.

## 1. Qualified Immunity: General Policies

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231. The doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). This

"accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). Qualified immunity is available "to ensure that fear of liability will not 'unduly inhibit officials in the discharge of their duties.'" *Camreta v. Greene*, 131 S. Ct. 2020, 2030 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

The Supreme Court has repeatedly stressed the importance of early review of qualified immunity defenses. "*Harlow* and *Mitchell* make clear that the defense is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery …, as '[i]nquiries of this kind can be particularly disruptive of effective government.'" *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996) (emphasis in original) (citation omitted). "The privilege is 'an *immunity from suit* rather than a mere defense to liability, and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (emphasis in original).

## 2. Qualified Immunity: The Fourth Amendment

"Fourth Amendment reasonableness 'is predominantly an objective inquiry.'" *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)). We inquire whether "the circumstances, viewed objectively, justify [the challenged] action." *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). If the action was justified objectively, it is reasonable whatever the officer's subjective intent. *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)). Qualified immunity shields officers from suits for damages if "a reasonable

officer could have believed [the challenged conduct] to be lawful, in light of clearly established law and the information the arresting officers possessed." *Hunter*, 502 U.S. at 227 (quoting *Anderson*, 483 U.S. at 641). A court "should ask whether the [officers] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed … years after the fact." *Id.* at 228.

### 3. Qualified Immunity: Summary Judgment

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (citation omitted). In determining what material facts are genuinely in dispute, the district court construes the evidence in the light most favorable to the nonmovant. *Weigel*, 544 F.3d at 1151.

### 4. The Material Facts Actually Found by the District Court

The first step in determining the constitutionality of the actions of the three law enforcement officers is to determine the material facts. *Scott v. Harris*, 550 U.S. 372, 378 (2007). After the district court does so, resolving genuine issues of material fact in favor of the nonmovant, the district court then measures those material facts against the substantive claim to see whether they could sustain a jury verdict on the claim. *See id.* at

380. On appeal, we review de novo the district court's legal determination. *Cortez*, 478 F.3d at 1115 (reviewing de novo the district court's denial of qualified immunity).

After reviewing the district court's findings, I disagree with the majority's characterizations that "[Mr. Leija] posed no threat to the police officers or anyone else"; that the "officers tased a subject who was not detained or not exhibiting active resistance"; that, while the district court's facts "indicate some level of resistance" "nothing suggests Mr. Leija's resistance was anything more than passive"; and that during this episode Mr. Leija can be fairly characterized as "a non-violent, non-threatening misdemeanant." Maj. Op. at 14, 15, 16, 19.

Contrary to the majority's characterizations, the facts show that during this episode Mr. Leija (because of his medical condition) was out of control. *See* Maj. Op. at 3–5. As I discuss below, the evidence shows that Mr. Leija was anything but passive, non-violent, and non-threatening. In fact, the doctor and male nurse called law enforcement for help in restraining Mr. Leija after concluding that they could not do it themselves. Appellant's App. vol. II at 434. During this time, Mr. Leija yelled and screamed delusional claims and accusations demonstrating that he was not in his right mind (claiming that he was God and Superman and that the hospital's staff was trying to poison him). *Id.* at 434-35. He had frightened the nurse and doctor with his aggressive behavior, causing the doctor to retreat from Mr. Leija's room after Mr. Leija acted aggressively and began stepping toward him. *Id.* Even early on, before tearing the IV needle from his arm in the hallway, Mr. Leija was bleeding sufficiently to leave blood on the floor, wall, and toilet. *Id.* at 433-34.

4

Nor did Mr. Leija's behavior become passive after the officers arrived. When the officers first encountered Mr. Leija, he was still yelling about being God and Superman and claiming that the hospital staff was trying to poison him. *Id.* at 435. In its opinion, the majority does not consider the effect this had on the welfare of other patients in the hospital or consider the possibility that someone in Mr. Leija's disturbed state might pose a threat to them. Mr. Leija was visibly agitated and upset. *Id.* Upon Officer Pickens's arriving, the doctor told him that Mr. Leija may die if he left the hospital. *Id.* Seeing that Mr. Leija was trying to leave the hospital, Officer Pickens got in front of him and tried to calm him. *Id.* Ultimately this failed, and Mr. Leija continued down the hallway toward the lobby. *Id.* After Officer Pickens again stopped him and continued trying to calm him, Mr. Leija continued with his aggressive behavior. *Id.* He tore the IV needle from his arm, causing more bleeding, and he then *faced the officers* and clenched and shook his fists. *Id.* After this, Mr. Leija removed the gauze and tape from his arms, causing yet more bleeding, and raised his arms, proclaiming that this was his blood. *Id.*

The district court also found that Deputies Atnip and Beebe then commanded Mr. Leija several times to step back, to calm down, and to get on his knees. Maj. Op. at 4–5; Appellant's App. vol. II at 435. They warned him that otherwise they would taser him.[1] *Id.* at 435-36. When Mr. Leija did not comply, Deputy Beebe fired the taser.[2] *Id.* at 436.

---

[1] Although the device used was a "Stinger," not a "taser," the two devices are similar and because the witnesses use the verb "taser," I do the same for ease of understanding.

[2] An officer can use a taser in one of two ways. First, the officer can use the taser for a "drive-stun," where the officer presses the taser against a person's body. Second, the

One of the two prongs hit Mr. Leija in the upper body but had no effect (presumably, because the second prong did not strike him). *Id.* Almost immediately, Deputy Atnip then grabbed Mr. Leija's left arm, and Officer Pickens grabbed his right arm. *Id.* Despite turning him to the wall, they still could not get his arms behind his back. Deputy Beebe then tried to "dry" stun Mr. Leija to relax his muscles and help Officer Pickens and Deputy Atnip get his arms behind his body. *Id.* This too had no effect. *Id.* Ultimately, after a struggle, one officer managed to buckle Mr. Leija's knee and all four men went to the floor. *Id.* During this episode, medical personnel were observing and standing by. *Id.* After the officers had Mr. Leija somewhat in control, the male nurse—with syringe in hand—asked them to hold Mr. Leija still so he could inject the medicine. *Id.* Almost immediately after the injection, Mr. Leija vomited and went limp. The officers stepped away, and medical staff tried to revive him. *Id.* That effort failed, and tragically Mr. Leija died. *Id.*

Even based on those limited fact findings—all taken in the Estate's favor as the party opposing summary judgment—I would conclude that the three officers did not use excessive force. To say that Mr. Leija was passive in this encounter is more than the facts can bear. In measuring the reasonableness of the three officers' conduct, the majority ignores the pressing need to restrain Mr. Leija to treat him. The doctor and male nurse obviously wanted to restrain him to the bed to administer medicine and get his oxygen level to a safe level. In addition, the majority ignores the danger to the officers from Mr.

---

officer can fire metal darts—prongs—into the body. *McKenney v. Harrison*, 635 F.3d 354, 364 (8th Cir. 2011) (Murphy, J., concurring).

6

Leija's steady stream of blood. Whether he was flinging it at them or not (and I will assume he did not since the district court specifically addressed that issue and did not find that Mr. Leija did fling his blood), the officers feared with good reason a wrestling match in which Mr. Leija's blood might injure them. As events proved, and as the doctor and male nurse had correctly surmised, Mr. Leija presented a physical challenge, even against superior numbers. The majority fails to consider that a successful tasering could have saved all four men from a dangerous physical tussle and could have led to Mr. Leija getting the medical care he so desperately needed.

In short, I believe the officers acted reasonably for their own safety and Mr. Leija's. They did not simply arrive and taser him without warning or provocation. They tried for several minutes to reason with him and calm him—even as Mr. Leija slowly made his way to the lobby and a possible death if he got outside the hospital. They tasered him when he refused their commands after all else had failed. Their other two alternatives— first using physical force against him or letting him walk out the door—were hardly attractive ones. Indeed, had they opted for either of those two choices and Mr. Leija still died, it is not hard to imagine the officers being sued for *not* using the taser.

I think the reasonableness of their actions is shown by a simple question: What else should the officers have done? At oral argument, the Estate's counsel suggested that one officer could have met with the doctor to learn more about Mr. Leija's condition while the others followed him down the hallway (and presumably out of the hospital and down the street). That itself is unreasonable. The majority criticizes the officers' actions because "[t]he situation the police officers faced in this case called for conflict resolution

7

and de-escalation, not confrontation and tasers." Maj. Op. at 14. Yet the majority offers nothing concrete for achieving that laudatory goal as the clock ticked on Mr. Leija's life-threatening medical condition. And lost in the majority's criticism is any acknowledgement that the officers *did* try to resolve and de-escalate the conflict.

Does the majority really contend that the three officers—facing this emergency situation in real time—acted incompetently or knowingly violated the law? *See Medina*, 252 F.3d at 1128. Does it contend that the officers should not be credited with a "mistaken judgment" if they really used excessive force? We must remember that "[b]ecause 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' … the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier*, 533 U.S. at 205 (quoting *Graham v. Conner*, 490 U.S. 386, 397 (1989)). The Supreme Court has "cautioned us against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene." *Id.* (quoting *Graham*, 490 U.S. at 393, 396).

### 5. The Material Facts That The District Court Likely Would Find

I agree with the majority that we do not have authority to review the record to challenge or reweigh the fact findings that the district court actually made for summary judgment. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995) (reviewing denial of summary judgment based on qualified immunity, and concluding that a party cannot appeal any part of district court's order based on "evidence sufficiency"—that is, "facts a party may,

8

or may not, be able to prove at trial"). Thus, I accept that the district court's material fact determinations (for summary judgment purposes) bind us at this stage. Accordingly, as I noted above, I give the Estate full credit on all those facts that the district court found.

But here, the district court failed to find or identify all the facts material to excessive force. It declared that "[t]he present case presents many material disputed facts as to the objective reasonableness of the force by Atnip, Beebe, and Pickens." Appellant's App. vol. II at 442. Clarifying this, the district court said that "[p]rimarily, the record is in dispute as to the degree of resistance exhibited by Leija after being confronted by the officers." *Id.* Along this same line, the district court found that "[t]he testimony of the officers is not consistent as to the nature of the aggressive behavior of Leija during [a] critical gap in the video."[3] *Id.* at 443. Additionally, the district court said that "the record is in dispute as to the degree of threat Leija posed to the officers or the public." *Id.* Here, it noted that no blood had splattered the officers, despite the officers saying that Leija had used his blood as a weapon. *Id.* Finally, the district court found genuine issues of material fact about "[t]he officers' knowledge of [Leija's medical] condition—and their efforts to ascertain information about Leija's condition before attempting to use any degree of force on him…."[4] *Id.*

---

[3] The word "gap" might suggest that the video was edited in some fashion to remove the images leading up to and including the tasering. In fact, the video is intact, but the camera looked down one hallway and not around a corner where that activity occurred.

[4] In view of these general pronouncements that genuine issues of material fact remain on these areas critical to qualified immunity, I must disagree with the majority that "the district court's ruling was fully explained." Maj. Op. at 8 n.1. In my view, it is insufficient for the district court to set forth facts on summary judgment that themselves

When a district court simply announces that there are "genuine issues of material fact" remaining, but does not identify and resolve them for summary judgment, we must delve into the record to find what material facts the district court likely would have found. *See Behrens*, 516 U.S. at 312-13. This makes sense because otherwise, defendants would have no way to inform the appeals court of the facts supposedly amounting to a violation of clearly established law. *See id. at* 312–13 (tasking the court of appeals with reviewing the record to determine what facts the district court likely assumed when the district court "did not identify the particular charged conduct that it deemed adequately supported" denial of summary judgment, but instead justified denial on the ground that "[m]aterial issues of fact remain"); *Johnson*, 515 U.S. at 319 (recognizing that when district courts fail to state the facts they relied upon to deny summary judgment, "a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed"); *see also Leatherwood v. Welker*, 757 F.3d 1115, 1117, 1119 (10th Cir. 2014) (reviewing district court's denial of summary judgment for qualified immunity on grounds that "questions of material fact remain regarding the existence of reasonable suspicion [for the search]," and saying that "[w]hen the district court does not set forth with specificity the facts it relied on, we may look to the record to determine which facts the court likely assumed").

---

do not defeat qualified immunity, but then to avoid any review by generally stating afterward that genuine issues of material fact remain on those same matters. Under that standard, the strong policies set forth by the Supreme Court favoring early disposition of qualified immunity defenses lose all force. *Hunter v. Bryant*, 502 U.S. at 227.

Here, the district court merely (and without explanation) found that genuine issues of material fact existed about Leija's degree of resistance. On that same subject, it concluded that the officers' testimony was "inconsistent" but never described in what way. Because of the importance of this latter conclusion, this is a good place to start our not-so-cumbersome review of the slim record for facts the district court would likely find in denying summary judgment.

Deputy Atnip testified that, before Deputy Beebe tasered Mr. Leija, Mr. Leija was shaking his clenched fists and asking Officer Pickens if he wanted to fight. Appellant's App. vol. I at 131-33; vol. II at 395. Deputy Atnip testified that Mr. Leija had his fists up with blood dripping from his hands. *Id.* vol. II at 397. He testified that Mr. Leija got close to Officer Pickens with blood dripping and that he (Deputy Atnip) then commanded Mr. Leija to get to his knees. *Id.* vol. II at 381. Deputy Atnip repeated the commands several times before Deputy Beebe fired the taser. *Id.* Deputy Atnip said that Mr. Leija never stopped being aggressive. *Id*. at 383.

Deputy Beebe also testified that Mr. Leija, with fists raised, asked Officer Pickens if he wanted to fight. *Id.* vol. I at 158. Soon after that, Mr. Leija ripped the IV port from his arm, causing blood to drip, and then raised his fists toward Officer Pickens. *Id.* As Officer Pickens backed up, he and Deputy Atnip then began commanding Mr. Leija to quit swinging his arms and to get on his knees. *Id.* at 159. Deputy Beebe further testified that Mr. Leija continued toward them, and that Deputy Beebe took about three steps back before firing the taser. *Id.* Deputy Beebe retreated because he did not want Mr. Leija's blood on him. *Id.* at 252. He believed that Mr. Leija was using his blood as a weapon. *Id.*

11

Officer Pickens testified about his efforts to talk to Mr. Leija. In addition to Mr. Leija's statements about the hospital staff trying to kill and poison him, Mr. Leija said he wanted his wife and wanted to leave the hospital. *Id.* at 242.Officer Pickens testified that, upon stopping Mr. Leija a second time in the hallway, Mr. Leija grew even angrier, that he pulled the gauze and needles from his arm, and that he began bleeding everywhere. Appellant's App. vol. II at 285, 288, 290. He testified that he stepped away because he was worried Mr. Leija's blood might get on him and injure him ("I didn't know what he had, if it was something I could get, so I stepped away from him."). *Id.* at 290. He described Mr. Leija's raising his arms over his head, both arms losing a fairly steady stream of blood. *Id.* at 290. He recollected Mr. Leija then saying that this was his blood, which he took to mean that Mr. Leija was going to use his blood as a weapon. *Id.* at 290-91. In addition, in an interrogatory answer, Officer Pickens stated that during this time, Mr. Leija had pounded his clenched fists on his thighs and sprayed blood. *Id.* at 430.

Although the district court did not explain why, it stated that the officers' testimony was inconsistent about the degree of Mr. Lejia's resistance. Officer Pickens certainly never testified that Mr. Leija had *not* challenged him to a fight. Nothing in the record shows anyone asking Officer Pickens about that. In the middle of his testimony about Mr. Leija's bloody arm raising, the Estate's counsel asked, "And you haven't left out anything, as far as any statements that he made or that you made to him? You've told me everything that happened up until the time that he raised his hands above his head and said, this is my blood?" *Id.* at 290-91. Officer Pickens responded, "As far as I know, yes." *Id.* at 291. I would not reward this indirect "tell me everything" question by foreclosing

12

Officer Pickens from asserting that Mr. Lejia asked him if he wanted to fight. The way to foreclose it is to ask about it directly.

Based on this record I have some difficulty concluding that the district court could likely find that Mr. Leija did not challenge Officer Pickens to fight. The two deputies were emphatic about it. The Estate apparently did not think it wise to ask Officer Pickens about it directly. We have no deposition testimony in the record from any of the other witnesses in the hallway saying that the deputies are wrong. Yet based on the district court's finding of "inconsistent testimony," I assume this is what it meant and accordingly think it would likely find for summary judgment purposes that Mr. Leija did not challenge Officer Pickens to fight.

But based on the undisputed record, I also think that the district court would likely find that Mr. Leija made threatening gestures that would cause the officers to fear for their safety. In addition, I think the district court would likely find that the officers had legitimate health concerns about exposing themselves to Mr. Leija's free-flowing blood. In measuring the degree of risk posed, the district court would likely credit the doctor's testimony about a trail of blood down the hallway. Appellant's App. vol. I at 229.

I believe that the district court would also likely find that the medical staff wanted the officers to subdue Mr. Leija so that they could treat his serious, deteriorating medical condition. The doctor stated that he considered physical force to ensure that Mr. Leija got the needed treatment, and that someone had gone to get soft restraints to immobilize him for medical care once he was subdued. *Id.* at 226. The male nurse testified that he had told the doctor that the two of them could not handle Mr. Leija. *Id.* at 103. After

13

observing Mr. Leija, the male nurse believed that more than two people were needed to approach Mr. Leija. *Id.* He felt he needed law enforcement for patient safety. *Id.* at 104.

Finally, I believe that the district court would likely find that the officers ordered Mr. Leija to stop and get on his knees, but that he would not comply. In addition to the officers' testimony, the doctor testified that he heard an officer loudly tell Mr. Leija to get to his knees, but that Mr. Leija continued down the hallway toward the officers without breaking stride. *Id.* at 229. The male nurse testified that he heard the officers tell Mr. Leija more than once to get on his knees, but that Mr. Leija did not comply. *Id.* at 108.

While I do not believe these additional findings are necessary to make the officers' response to the emergency situation reasonable, I believe that they make it all the more reasonable. They further support my view that the officers did not use excessive force in violation of the Fourth Amendment.

**6. Clearly Established Law**

Even if the officers acted with excessive force under the Fourth Amendment, I still believe they would be entitled to summary judgment. They would be entitled to this "unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *Ashcroft*, 131 S. Ct. at 2080). "And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood he was violating it." *Id.* at 2023 (quoting *Ashcroft*, at 2083-84). "In other words, 'existing precedent must have placed the statutory or constitutional question'

14

confronted by the official 'beyond debate.'" *Id.* (citation omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris*, 672 F.3d at 1196. But because cases almost never have exactly the same circumstances, we require less that way as the conduct becomes more obviously egregious. *Id.*

In its sole reference to the second prong of qualified immunity—clearly established law—the district court simply noted that "[t]he reasonableness standard is clearly established for the purposes of a section 1983 action … and it requires courts to balance several factors including the severity of the crime, the degree of the threat the subject poses to the safety of the officer and the public, and the subject's cooperation or resistance." Appellant's App. vol. II at 442 (citation omitted). Yet the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (quotation marks and citation omitted). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft*, 131 S. Ct. at 2084.

At oral argument, counsel for the Estate commendably began his argument by acknowledging that he had no cases with similar facts. The majority faces this same problem. Even so, it still apparently concludes that clearly established law advised the

15

officers "beyond debate" that their actions amounted to excessive force. To get there, the majority relies on our "sliding scale" analysis, in which "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Morris*, 672 F.3d at 1189 (quoting *Johnson*, 515 U.S. at 319). In this regard, it notes that "the qualified immunity analysis involves more than a 'scavenger hunt for prior cases with precisely the same facts.'" Maj. Op. at 20; *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010) (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)).

As its strongest case from our circuit supporting its notion that the three officers here violated clearly established law, the majority relies upon *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007). In that case, we reversed the grant of summary judgment based on qualified immunity. *Id.* at 1287. The facts of the case are shocking. Casey challenged a traffic ticket and lost. *Id.* at 1279. After ruling, the judge handed him the case file and told him to take it to the cashier's window to pay the fine. *Id.* His eight-year-old daughter visited the restroom while Casey went to the parking lot to get money to pay the fine. *Id.* A court clerk told him not to take the file outside the building, but Casey responded that he would be right back after getting his money. *Id.* As he returned with the court file and money to pay his fine, Officer Sweet intercepted him and ordered him back to his truck. *Id.* at 1280. Casey replied that he needed to return the file and get his daughter. *Id.*

When Casey moved around him to take the file to the cashier, the officer grabbed Casey's arm and put it in a painful arm-lock. *Id.* As Casey tried to continue to the

16

courthouse, the officer jumped on his back. Office Lor then arrived and almost immediately tasered Casey. *Id*. With more officers now there, the officers took Casey to the ground and repeatedly banged his face into the concrete. *Id*. While Casey was on the ground, Officer Losli tasered him again with a "dry" stun. *Id*. Officer Lor tried to tase Casey a third time before being told to put her taser away after she hit another officer instead. *Id*.

As a second case, the majority relies on *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001). In this case, police responded to a call that a man was running around naked. *Id*. at 1185. Upon seeing him and his lively behavior (jumping up and down on an exterior landing of an apartment building, yelling, and kicking his legs up and down), police called for an ambulance. *Id*. After trying to calm him and coax him down, the officers finally succeeded and Cruz came down to the ground but tried to walk past them. *Id*. The officers wrestled him to the ground and handcuffed him face down. *Id*. To stop his kicking, the officers wrapped a nylon restraint around his ankles. *Id*. The record had some evidence that the officers had "hog-tied" him, that is, tied his ankles within a foot of his wrists. *Id*. Before the ambulance arrived, Cruz's face blanched, leading the officers to remove the restraint. *Id*. The emergency crew unsuccessfully tried CPR, but Cruz died. *Id*. His autopsy revealed a large amount of cocaine in his system. *Id*.

On appeal, we noted that our circuit had not yet ruled on the validity of hog-tie restraints. *Id*. at 1188. We held that officers "may not apply this technique when an individual's diminished capacity is apparent." *Id*. Although recognizing cases from other jurisdictions, we could not say that "a rule prohibiting such a restraint in this situation

17

was 'clearly established' at the time of this unfortunate incident." *Id*. at 1189. I simply observe that the cases on hog-ties were more plentiful and on point than the majority's cases offered in support of its decision in this case.

Reviewing the three factors set forth in *Graham*, 490 U.S. at 396, we found it debatable whether Casey's conduct even amounted to a crime. *Casey*, 509 F.3d at 1281. We found that Officer Sweet had no reason to believe that Casey posed a threat to anyone's safety. *Id*. at 1282. And finally, we concluded that when Officer Sweet used physical force on Casey, Casey was "neither 'actively resisting arrest' nor 'attempting to evade arrest by flight.'" *Id*. (quoting *Graham*, 490 U.S. at 396). Although we located no case in which a citizen was peacefully trying to return to a courthouse and then "tackled, Tasered, knocked to the ground by a bevy of police officers, beaten, and Tasered again, all without warning or explanation," we denied Officer Sweet qualified immunity. *Id*. at 1285. We also denied it to Officer Lor after noting that we knew of no circuit court that had "upheld the use of a Taser immediately and without warning against a misdemeanant like Mr. Casey." *Id*. at 1286.

I disagree that the three officers in the present case could read *Casey* and know that it clearly established they could not taser Mr. Leija in the circumstances of this case. I fail to understand how the majority likens the peaceful Mr. Casey to the combative Mr. Leija. Nor do I understand how the two cases compare when Mr. Leija was warned about the taser if he did not comply with the officers' directions, while Mr. Casey was tackled and tasered twice for no apparent reason, except perhaps for overzealous officers who lacked any sense or judgment. In relying upon *Casey*, the majority continues to ignore the

18

pressing need for the officers to do what the medical staff wanted and needed—control of Mr. Leija so he could be treated rather than allowed to drift outside untreated, where the doctor said he would probably die. In short, I think, if anything, *Casey* helps the officers here because they had a need to use the taser and warned Mr. Leija before using it.

In addition, the majority relies on a string of cases from outside our circuit involving "the use of tasers against the mentally ill [that] have found it clearly established that officers may not tase non-criminal, non-threatening subjects who primarily exhibit passive resistance." Maj. Op. at 20. Again, describing Mr. Leija in those terms disregards the facts. On inspection, none of these cases resemble Mr. Leija's case and provide no basis for a conclusion that the three officers here should have known that their actions violated clearly established law. None of the cited cases involves the same medical emergency here or a corresponding need for force to subdue a combative person endangering his own life because his medical condition had deprived him of his ability to continue to undergo necessary treatment. As such, the cases offer no help.

The majority understates it when it says that "[t]hese cases do not exactly mirror the factual circumstances of our case." Maj. Op. at 21. *See Oliver v. Fiorino*, 586 F.3d 898, 901-02 (11th Cir. 2009) (affirming denial of summary judgment for qualified immunity in case where man appearing mentally unstable but not accused or suspected of a crime was tasered 8 to 12 times for five seconds each while he was lying on hot pavement immobilized and clenched up, allegedly resulting in his death); *Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1242-44 (M.D. Ala. 2010) (denying summary judgment on qualified immunity grounds for a mentally ill woman who while strapped to a gurney but

19

struggling and screaming was tasered three times, first on her right leg, then on her left leg as she screamed, "I give up," and finally on her face, knocking her unconscious); *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1194 (D. Colo. 2009) (after a mentally ill woman denied police entry into her home, an officer cut the screen on her door and used it to fire his taser into her stomach, never warning her or telling her of their intent to take her into custody).

I disagree that any of the majority's cases would put the three officers on notice that their actions would amount to excessive force. The majority fails to acknowledge the urgency of Mr. Lieja's medical condition and the danger he posed to the officers and others. The majority's broad rule against the use of tasers compels officers desiring not to be sued to resort first to physical force in restraining individuals needing to be restrained for their own protection. In my mind, it disregards the risks to law enforcement from violent physical encounters and will "unduly inhibit [officers] in the discharge of their duties." *Camreta*, 131 S. Ct. at 2030.

For these reasons, I respectfully dissent.